1
2
3
4
5                        UNITED STATES DISTRICT COURT

6                      NORTHERN DISTRICT OF CALIFORNIA

7

8    ALAN BUSCHMAN,                          No. C-13-1787 EMC

9              Plaintiff,

10         v.                                **FINAL PRETRIAL CONFERENCE
                                             ORDER**
11   ANESTHESIA BUSINESS CONSULTANTS
     LLC, *et al.*,

12

13             Defendants.
     _____/

14

15

16              **I.    TRIAL DATE & LENGTH OF TRIAL**

17         Jury selection shall commence on Monday, September 8, 2014, at 8:30 a.m.  Trial days

18   normally shall last from 8:30 a.m. to 2:00 p.m. (or slightly longer to finish a witness), with one 15-

19   minute break and one 30-minute lunch break.  Parties must arrive by 8:00 a.m. or earlier as needed

20   for any matters to be heard out of the presence of the jury.  The jury shall be called at 8:30 a.m.  The

21   trial week is Monday through Friday, excluding holidays.  Thursdays are dark.  Each side will be

22   given 8 hours total to present its case; this includes time taken for opening statements, examination

23   of witnesses (each side's time on direct and its cross-examination) and closing arguments.

24              **II.   PROCEDURE FOR EXHIBITS AT/DURING TRIAL**

25   A.    No later than the end of each trial day, counsel shall inform opposing counsel of which

26         exhibits (including demonstrative evidence), if any, he or she intends to introduce during the

27         next trial day and, if necessary, with respect to which sponsoring witness.  If any such

28         exhibits are still objected to, both counsel shall notify the Court after the jury is excused for

**United States District Court**
For the Northern District of California

the day and shall identify the exhibits at issue and the objections.  The Court will then schedule a conference that afternoon or the following morning to resolve the dispute.

B.    At the end of each trial day, counsel shall also provide opposing counsel with a tentative preview of the exhibits he or she intends to introduce during the trial day after next.  Parties are directed to make a good faith effort to ensure such previews are as accurate as possible.

C.    With respect to exhibits to be used on the first day of trial, counsel shall inform opposing counsel of which exhibits, if any, he or she intends to introduce by Thursday, September 4, 2014, at 5:00 p.m.  If any such exhibits are still objected to, both counsel shall notify the Court by September 5, 2014, at 2:00 p.m., and shall identify the exhibits at issue and the objections.  The Court will then address the dispute on the first day of trial, September 8, 2014, before any testimony begins.

D.    If a party intends to use a projector or other equipment to show an exhibit (or demonstrative) to the jury, that equipment shall be set up and ready for use by 8:30 a.m. each day.  The parties should immediately file with the Court, if necessary, administrative requests to bring projectors and/or other equipment to the courthouse for use at trial.

### III.    PROCEDURE FOR WITNESSES AT/DURING TRIAL

A.    Each party shall be prepared, during its case in chief or any rebuttal, to present its next witness.  At any time, if the party whose case is being presented is not prepared to present its next witness, that party shall be deemed to have rested that portion of its case.  No further witnesses shall be permitted by the party who has so rested in that portion of the case (*e.g.*, case in chief or rebuttal).

B.    Counsel are expected to cooperate with each other in the scheduling and production of witnesses, including informing one another of witness order.  At the end of each trial day, Counsel shall give opposing counsel notice of which witnesses will be testifying on the following day.  At that time, counsel shall also provide a tentative preview of witnesses who are expected to testify the day after next.  Witnesses may be taken out of order if necessary.  Every effort shall be made to avoid calling a witness twice (as an adverse witness and later as a party's witness).

2

**United States District Court**
For the Northern District of California

C.    Only one lawyer for each party may examine any single witness and make objections.

D.    If a witness is testifying at the time of a recess or adjournment and has not been excused, the witness shall be seated back on the stand when the Court reconvenes.  If a new witness is to be called immediately following recess or adjournment, the witness should be seated in the front row, ready to be sworn in.

E.    Counsel shall refrain from eliciting testimony regarding any undisputed facts as set forth in any stipulation filed with the Court.  The Court may read to the jury such undisputed facts at appropriate points in the trial.

F.    Witnesses shall be excluded from the courtroom until completion of their testimony.

**IV.    OTHER PROCEDURES AT TRIAL**

A.    To make an objection, counsel shall rise, say "objection," and briefly state the legal ground (*e.g.*, hearsay or irrelevant).  There shall be no speaking objections or argument from either counsel unless requested by the Court.

B.    Bench conferences, or the equivalent of sidebars, will not be permitted absent truly extenuating circumstances.  Disputes regarding exhibits shall be resolved as set forth in Part II, *supra*.  Any other disputes or problems should be addressed either before the trial day commences, at the end of the trial day, or during a recess, if necessary.

**V.    PRELIMINARY LEGAL ISSUES**

During the pre-trial conference, the Court ordered the parties to meet and confer regarding jury instructions to determine whether, in light of the Court's rulings on the various motions in limine (memorialized below), they could reduce or eliminate the remaining disputes regarding the jury instructions in this case.  In response, two legal issues were discussed, specifically: (1) Whether Buschman will be able to recover noneconomic damages; and (2) the availability of the mitigation of damages defense.

A.    Buschman Will Not Be Permitted to Seek Noneconomic Damages

In the proposed jury instructions that were filed, Buschman proposed an instruction on the concept of non-economic damages – particularly, past mental suffering, loss of enjoyment of life,

**United States District Court**
For the Northern District of California

1 anxiety, and emotion distress.  Docket No. 74, at 55.  ABC objects to the inclusion of noneconomic

2 damages in this action for a number of reasons.

3      Buschman will not be permitted to seek noneconomic damages in this action for the simple

4 reason that his complaint – which frames the scope of this action – does not seek them.  A complaint

5 defines, and limits, the scope of an action.  *See Doelle v. Mountain States Tel. & Tel.*, 872 F.2d 942

6 (10th Cir. 1989) ("The plaintiffs original complaint did not seek punitive damages, exemplary

7 damages, or damages for mental distress.  Because the plaintiff did not seek such damages in his

8 original complaint, the district court could not award them without permitting the plaintiff to

9 amend.").  Under both his negligence and breach of contract causes of action, Buschman alleged:

10 "As a direct, proximate result of Defendant's [negligence/breach of contract], Plaintiff is not

11 receiving benefits under the UNUM GLTDP, and is precluded from receiving those benefits.

12 Plaintiff thus has suffered monetary damage in an amount subject to proof at trial."  Compl. ¶¶ 34,

13 39.  Buschman has never sought to amend his complaint to add a request for noneconomic damages.

14 It is too late to reopen discovery.

15      In addition, even if Buschman had properly sought to assert a claim for noneconomic

16 damages, the Court would have been disinclined to permit the theory to proceed.  At the pre-trial

17 conference, Buschman revealed that the basis for his alleged mental distress was, in large part, the

18 litigation tactics and actions by ABC's counsel during this case.  Putting aside potential questions of

19 waiver as well as the applicability of California's Anti-SLAPP statute, putting forward evidence of

20 such a theory raises serious Rule 403 concerns and would threaten to derail the litigation, which

21 concerns the termination of Buschman's disability insurance in 2006, not the conduct of this

22 litigation.

23      Buschman will be limited to the damages asserted in the complaint: the benefits to which he

24 believes he is entitled under the UNUM group disability insurance policy.

25 B.   <u>Mitigation of Damages</u>

26      In the proposed jury instructions, Buschman included the following statement in his

27 objection to proposed mitigation of damages instructions:

28

United States District Court

For the Northern District of California

> Moreover, an instruction on this topic is inappropriate as it ignores this Court's summary judgment ruling and threatens to confuse the jury. The Court ruled as a matter of law that "Dr. Buschman's causes of action did not accrue until he became [disabled] and suffered actual injury as a result of his disability policy having been terminated."  As such, Dr. Buschman did not suffer damages until he became disabled in 2012 at the earliest.  It then follows that there was no way for Dr. Buschman to mitigate his "damages" *before* becoming disabled, since no such damages existed.

Docket No. 74, at 60-61.  At the pre-trial conference, Buschman seemed to retreat from this position and the parties appeared to agree that the relevant question for mitigation of damages is whether Buschman knew of the breach; the parties agreed that the contractual duty to mitigate arises upon actual knowledge of the breach.

So there is no doubt, the Court holds that Buschman had a duty to mitigate upon receiving knowledge of the breach – even if, at the time of the breach, no "damages" had yet been sustained (and thus no cause of action had accrued).  California law makes clear that the duty to mitigate damages arises when the plaintiff becomes aware of the breach.  *See, e.g.*, *Vitagraph, Inc. v. Liberty Theatres Co. of Cal.*, 197 Cal. 694, 698-99 (1925); *see also Foster v. Financial Tech. Inc.*, 517 F.2d 1068, 1072 (9th Cir. 1975) ("Under the familiar mitigation of damages principle, a party cannot recover that part of his loss caused by his own failure, once he has reason to know of the breach, to take reasonable steps to avoid further harm.").[1]  In cases like this, the duty to mitigate is perhaps more accurately labeled a duty to avoid damages, but the ultimate result is the same.  *Cf. Brant v. Gallup*, 111 Ill. 487, 497-98 (1885) ("Knowing the amount [of insurance] they had ordered, if not satisfactory, and the contract was broken by a failure to order more, it was the duty of appellant to procure such an amount as he regarded necessary, and failing to do so . . . he could not recover.").

///

///

---

[1] The parties agreed that the standard under the comparative fault test applicable to Buschman's negligence action does not require actual knowledge of the breach.  *Cf. First Nat'l Ins. Agency, Inc. v. Leesburg Transfer & Storage, Inc.*, 139 So.2d 476, 482-83 (Fla. Dist. Ct. App. 1962) ("[H]ad plaintiff's theory of action been grounded on defendant's negligence for failure to procure the insurance in question, plaintiff would have been subject to the defense of contributory negligence going to whether or not its loss resulted from its own inaction in failing to ascertain the extent of its coverage for a period of four months after receiving renewal notices showing that coverage had not been increased.").

**United States District Court**
For the Northern District of California

1

## VI.   DEFENDANT'S MOTIONS IN LIMINE

2   A.   Motion in Limine No. 1: Admissibility of Parol Evidence and Evidence of Other Contracts

3          In its first motion in limine, ABC seeks to prevent Buschman from introducing evidence of

4   any contracts other than a 1995 contract between Northern California Anesthesia Physicians, Inc.

5   ("NCAP") and Anesthesiologists Associated, Inc. ("AAI").  Relatedly, ABC also seeks to prevent

6   Buschman from introducing extrinsic evidence interpreting the terms of the operative contract

7   beyond its plain, unambiguous terms.  While these two issues are related, they should have been

8   brought as distinct motions in limine pursuant the Court's Case Management and Pretrial Order.  *See*

9   Docket No. 24, at 6 ("Each motion in limine should address a single topic and contain no more than

10   seven pages of briefing per side.").  Given this motion in limine arguably raises two legal issues, the

11   Court will consider Buschman's opposition despite the fact that it exceeds seven pages.

12          For the following reasons, ABC's first motion in limine will be **DENIED**.

13          1.   Background

14          To provide the context for this motion in limine, the following is a brief chronological

15   synopsis of the events leading to this lawsuit as well as the contracts and transactions whose

16   relevance to this action are disputed. This account is either taken from the parties' list of stipulated

17   facts contained in the pre-trial conference statement or from the copies of the agreements attached as

18   exhibits to the Declaration of Garth Rosengren.

19          Dr. Buschman is a founding member and sometime board member of NCAP.  Docket No.

20   67, at 5.  NCAP is a group of practicing anesthesiology physicians in the San Francisco Bay Area.

21   *Id.*  As these physicians do not have traditional brick and mortar offices or staffs, NCAP – through

22   its arrangement with AAI and later ABC – provided day-to-day administrative "office" management

23   for its member physicians.  *Id.*

24          In 1995, NCAP and AAI entered into a "Billing and Related Services Agreement" ("1995

25   Agreement").  *Id.*  Under this agreement, AAI agreed to provide "Practice Management Services" to

26   NCAP which included, among other things, payroll administration related to employee benefits –

27   including insurance-related benefits.  *Id.*  Specifically, the relevant portion of the 1995 Agreement

28   provided:

**United States District Court**
For the Northern District of California

**ARTICLE I.  SERVICES.**  AAI shall provide the following services to Client during the term of this Agreement:

. . . .

1.04.  **Practice Management Services.**  These services shall include:

\*      Management assistance and related services to Client regarding capitation, pooled income reporting, bookkeeping, payroll, accounts payable, disbursement, support documents for tax filings, credentialing and contract negotiations.

\*      Liaison with Client's pension administrator and outside accountant

\*      Transmission of payroll and pension contributions

1995 Agreement, art. 1, § 1.04 (Docket No. 49-1).  The 1995 agreement contains a termination clause.  *Id.* art. 8, § 8.02.

In December 1996, AAI entered into a "Billing and Related Services Agreement" with Buschman directly ("1996 Buschman Agreement").  Docket No. 49-2.  Under this agreement, AAI again agreed to provide various administrative tasks for Buschman.  The services AAI agreed to perform under this agreement revolved around "routine billing and collection services" including "billings to patients and third party payors, managing [Buschman's] accounts receivable and making weekly deposits to [Buschman's] bank account of payments received by AAI on behalf of [Buschman]."  *Id.* art. 1, § 1.01.  As with the 1995 Agreement, the 1996 Buschman Agreement contained an integration clause stating it constituted the "entire final Agreement between parties."  *Id.* art. 11, § 11.01.

In 2003, NCAP began offering its employees – including Buschman – enrollment in a long term group disability insurance plan, number 581086 0011, provided by Unum Life Insurance Company of America.  Docket No. 67, at 6.  The parties agree that the "Practice Management Services" AAI was obligated to provide NCAP under the 1995 Agreement included the "administering of, handling, and payment of insurance and disability insurance premiums, including group long-term disability policy, number 581086 0011."  *Id.*  AAI would pay the monthly insurance premiums to UNUM on behalf of NCAP, with the premium set based on the number of physicians enrolled in the long term disability policy.  *Id.*  AAI would receive the UNUM statement and would

7

United States District Court

For the Northern District of California

1  directly issue a check to UNUM.  *Id.*  AAI would then "deduct the amount of each participating

2  physician's share of the premium for the group long-term disability policy from that physician's

3  payroll check."  *Id.*  AAI would provide each NCAP physician with monthly and annual statements

4  and payroll stubs which would reflect, among other things, the amounts that were deducted to pay

5  that physician's share of the long-term group disability premium.  *Id.*

6        Buschman enrolled in the group long-term disability policy in 2003.  *Id.*  His share of the

7  monthly premium was $390.01 which was deducted monthly from his income as an NCAP

8  employee until January 2006.  *Id.* at 7  In 2006, for reasons that are disputed, Buschman's

9  participation in the group long-term disability policy was cancelled by AAI effective February 1,

10  2006.  *Id.*

11        On November 1, 2006 (ten months after Buschman's group-insurance coverage had been

12  cancelled), AAI and NCAP entered into a new a "Services Agreement" ("2006 Agreement").

13  Docket No. 49-4.  The 2006 Agreement provided that AAI agreed to provide the services described

14  in an attachment (Exhibit A) to that Agreement.  *Id.* art. 1, § 1.1.  Among the services listed were

15  "Financial Services" which, among other things, included (1) "[p]rocessing and payment of Client

16  expenses including insurance premiums, employee benefits and general business expenses"; (2)

17  "[p]reparation of monthly financial statements for Client and for the individual physician members

18  of Client"; and  "[a]ssistance to Client's insurance broker in selection and administration of group

19  insurance options."  *Id.* Ex. A, § A-1.4.  As with the 1995 Agreement and 1996 Buschman

20  Agreement, the 2006 Agreement included an integration clause.  *Id.* art. 13, § 13.1.  The 2006

21  Agreement was subsequently amended to extend the term of the agreement and, eventually, to

22  replace all references to AAI to read ABC.

23        In 2008, as described by ABC in its motion in limine, ABC took over "providing services for

24  NCAP . . . after AAI was acquired by ABC's parent company Miramed."  Docket No. 53, at 5.

25        2.    Discussion

26        ABC's first motion in limine essentially attacks one of the two breach of contract theories

27  Buschman has alleged in his complaint.  His breach of contract action alleges that ABC breached

28  both the 1995 Agreement and 2006 Agreement by (1) "incorrectly reporting to UNUM that Plaintiff

had been 'terminated' from NCAP, thus causing UNUM to cancel" the group disability policy, *and* (2) "failing to inform Plaintiff that his coverage" had been cancelled.  Compl. ¶ 33.  ABC first contends that the 1995 Agreement is the only legally cognizable agreement for Buschman's breach of contract cause of action.  Second, it argues that Plaintiff may not rely on extrinsic evidence to import an additional "duty to notify" that does not appear on allegedly clear and unambiguous terms of the 1995 Agreement.

> a.   The 1995 Agreement Is Ambiguous, Thus Permitting Extrinsic Evidence to Be Used to Interpret Its Terms

ABC contends that the duties assumed by AAI in the 1995 Agreement are clearly delineated and do not include any requirement that AAI notify any NCAP physician regarding the state of his group disability policy coverage.  Docket No. 53, at 7.  Accordingly, ABC argues that the 1995 Agreement is unambiguous insofar as it is not "reasonably susceptible" to Buschman's interpretation and, therefore, extrinsic evidence may not be used to alter its terms.  ABC thus argues that Buschman should be precluded from introducing extrinsic evidence to establish or interpret the meaning of that agreement.

Under the traditional contract principles, "extrinsic evidence is inadmissible to interpret, vary or add terms of an unambiguous integrated written instrument."  *Trident Center v. Connecticut General Life Ins. Co.*, 847 F.2d 564, 568 (9th Cir. 1988).  By contrast, while extrinsic evidence may never "be relied upon to alter or add to the terms of the writing," it is nonetheless admissible to "explain or interpret ambiguous language."  *See Rosenfeld v. Abraham Joshua Heschel Day School, Inc.*, 226 Cal. App. 4th 886, 897-98 (2014).  A contractual provision is ambiguous only if it is reasonably susceptible of two or more interpretations."  *In re Tobacco Cases I*, 186 Cal. App. 4th 42, 48 (2010).

California, however, has deviated from traditional parol evidence principles by permitting extrinsic evidence to be used to establish ambiguity in an otherwise facially unambiguous provision.  In  *Pacific Gas & Electric Company v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33 (1968), the California Supreme Court rejected the argument that a trial court could reject extrinsic evidence solely on the basis that it appeared to contradict an otherwise unambiguous term.  It stated:

> The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.

*Id.* at 37.  The Court noted that a rule which would "limit the determination of the meaning of a written instrument to its four-corners merely because it seems to the court to be clear and unambiguous, would either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained." *Id.*  The Court justified this approach by recognizing that words "do not have absolute and constant referents" but rather must be interpreted "in light of all the circumstances that reveal the sense in which the writer used the words." *Id.* at 38.  Thus:

> Although extrinsic evidence is not admissible to add to, detract form, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose.  The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms.

*Id.* at 39.  In *Trident Center v. Connecticut General Life Ins. Co.*, 847 F.2d 564 (9th Cir. 1988), the Ninth Circuit found that *Pacific Gas* had a substantial impact on California contract law:

> Under *Pacific Gas*, it matters not how clearly a contract is written, nor how completely it is integrated, nor how carefully it is negotiated, nor how squarely it addresses the issue before the court: the contract cannot be rendered impervious to attack by parol evidence. If one side is willing to claim that the parties intended one thing but the agreement provides for another, the court must consider extrinsic evidence of possible ambiguity. If that evidence raises the specter of ambiguity where there was none before, the contract language is displaced and the intention of the parties must be divined from self-serving testimony offered by partisan witnesses whose recollection is hazy from passage of time and colored by their conflicting interests.

*Id.* at 568.  Accordingly, California's parol evidence rule requires a two-step inquiry.  First, the court must provisionally receive (without admitting) "all credible evidence concerning the parties' intentions to determine 'ambiguity.'"  *Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1351 (2004).  Second, if, in light of this extrinsic evidence, the court finds the language is "reasonably susceptible" to the interpretation advanced, the extrinsic evidence is then admitted to aid in the interpretation of the contract.  *Id.*

1    Ultimately, because the Court concludes that the 1995 Agreement is simply ambiguous *on its*

2    *face*, it need not address whether, under *Pacific Gas*, extrinsic evidence renders it ambiguous.  *See*

3    *Universal Green Solutions, LLC v. VII Pac Shores Investors, LLC*, No. C-12-5613-RMW, 2014 WL

4    1994880, at *2 (N.D. Cal. May 15, 2014) ("[T]he court can determine whether the contract is

5    ambiguous on its face or by using extrinsic evidence of the parties' intent.").  The 1995 Agreement

6    is vague as to the precise nature of the services AAI would provide NCAP and its physicians.  As

7    the language quoted above indicates, the agreement called for AAI to provide "practice management

8    services."  Rather than precisely define these services, the 1995 Agreement states that they "*shall*

9    *include*" such things as (1) "[m]anagement assistance *and related services*" to the physicians and (2)

10   "[t]ransmission of payroll and pension contributions."  1995 Agreement, art. 1, § 1.04 (emphases

11   added).  The "practice management services" term, as discussed in the 1995 Agreement, is

12   ambiguous.  First, the introductory phrase "shall include" suggests the listed services are merely

13   illustrative.  *Cf. Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331, 338 (4th Cir. 2012)

14   ("Courts have repeatedly indicated that 'shall include' is not equivalent to 'limited to.'").  Second,

15   the specific enumerated "practice management services" such as "management assistance"

16   (particularly when coupled with the even more amorphous "related services") and "transmission of

17   payroll and pension contribution" do not provide a clear, plain meaning.  *Cf. In re Western Asbestos*

18   *Co.*, 416 B.R. 670, 695 (N.D. Cal. 2009) (finding agreement ambiguous because there was "no plain

19   meaning contained within the agreement itself regarding the purpose for and limitations on

20   Hartford's audit/review rights, and also regarding Hartford's 'copying' rights"); *Stonebrae, LP v.*

21   *Toll Bros., Inc.*, No. C08-0221 EMC, 2009 WL 1082067 (N.D. Cal. Apr. 22, 2009) (finding term

22   "Default Notice" to be ambiguous because the agreement merely stated the notice must be written –

23   "[n]owhere does the Agreement specify what the contents of a Default Notice must be"); *Lebas*

24   *Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group*, 50 Cal. App. 4th 548, 560 (1996) (finding

25   terms "misappropriation," "advertising idea," and "style of doing business" in an insurance policy to

26   be ambiguous as these terms did not have "a single, plain and clear meaning").

27           The facial ambiguity is perhaps most clearly demonstrated by the parties' stipulation of facts.

28   ABC has conceded by stipulation that under the 1995 Agreement, AAI agreed to take on the

United States District Court

For the Northern District of California

1  "administering of, handling, and payment of insurance and disability insurance premiums."  Docket

2  No. 67, at 6.  It is not evident, however, from what provision in the 1995 Agreement this obligation

3  arose as the Agreement does not expressly speak of insurance premiums.  For example, while

4  handling and payment of the insurance proceeds may be construed as fitting within the

5  "transmission of payroll and pension contribution" (if it is accepted that insurance premiums

6  constitute "payroll" contributions), the parties' stipulation speaks more broadly of "administering"

7  the insurance premiums – a term that suggests more than serving as a mere conduit for payment.[2]

8  It therefore appears that the parties, including ABC, have agreed that the 1995 Agreement

9  encompassed obligations that are not expressly addressed by the plain terms of the agreement; this

10  underscores the ambiguity of the language of the 1995 Agreement.

11         In light of the above, the Court is unable to determine whether the parties to the 1995

12  Agreement intended that "practice management services" include the obligation that AAI notify

13  NCAP physicians when, and if, their coverage was terminated without recourse to extrinsic

14  evidence.  Accordingly, the broad, somewhat amorphous, language of the 1995 Agreement is

15  "reasonably susceptible" to Buschman's interpretation, permitting the use of extrinsic evidence to

16  aid in the interpretation of the provision.  The Court further notes that use of extrinsic evidence to

17  support this interpretation does not impermissibly vary, add to, or contradict the express terms of the

18  1995 Agreement.  Rather, it provides an interpretation of the ambiguous terms discussed above –

19  "management assistance service," "related service," etc.  *See, e.g.*, *In re Western Asbestos Co.*, 416

20  B.R. at 699-700 (using extrinsic evidence to interpret ambiguous "audit right" provision in

21  settlement agreement and imposing limitation that information obtained under the audits could only

22  be used in limited circumstances).  Accordingly, Buschman will be able to submit extrinsic evidence

23  in support of his interpretation, and ABC will likewise be permitted to rebut this evidence and assert

24  that the 1995 Agreement does not contain the asserted "notification" obligation.  Ultimately, the

25  resolution of any disputed extrinsic evidence and the contract's meaning in these circumstances will

26

27         [2] In fact, "administration" of insurance premiums – an obligation that is not facially
articulated in the 1995 Agreement – could be read as including an obligation that AAI (as
28  "administrator" of the premiums) notify client physicians when the coverage was terminated.

be a question for the jury. *See, e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh v. Argonaut Ins. Co.*, 701 F.2d 95 (9th Cir. 1983 ("[A]mbiguity in a contract raises a question of intent, which is a question of fact . . . ."); *Cotran v. Rollins Hudig Hall Int'l, Inc.*, 17 Cal. 4th 93 (1998) ("If the terms of the contract are ambiguous or uncertain . . . determining the contract's term is a question of fact for the trier of fact (here the jury), based on 'all credible evidence concerning the parties' intention . . . .'").[3]

Accordingly, to the extent ABC seeks to preclude introduction of extrinsic evidence to interpret the 1995 Agreement, its first motion in limine is **DENIED**.[4]

> b.    Relevance of Post 1995-Agreements

In addition to arguing that the 1995 Agreement is unambiguous and therefore immune from extrinsic evidence, ABC also contends that Buschman should be precluded from introducing evidence relating to the post-1995 Agreements on the ground they are irrelevant. The Court first addresses the admissibility of evidence relating to the 1996 Buschman Agreement before turning to the 2006 Agreement.

Buschman argues that the agreement is relevant to (1) show his "overall reliance on AAI/ABC to serve as the administrative office NCAP lacked" and (2) "shows, consistent with AAI's

---

[3] If, however, no extrinsic evidence is actually presented -- or, if the extrinsic evidence is not in conflict, resolution of the contract's ambiguity is a question of law:

> The trial court's determination of whether an ambiguity exists is a question of law, subject to independent review on appeal. The trial court's resolution of an ambiguity is also a question of law *if no parol evidence is admitted or if the parol evidence is not in conflict.* However, where the parol evidence is in conflict, the trial court's resolution of that conflict is a question of fact . . . .

*Wolf*, 114 Cal. App. 4th at 1351 (citation omitted); *see also Cetigram Argentina, S.A. v. Centigram Inc.*, 60 F. Supp. 2d 1003, 1007 (N.D. Cal. 1999) ("Interpretation of the contract is an issue of law if a) the contract is not ambiguous, or b) the contract is ambiguous but no parol evidence is admitted or the parol evidence is not in conflict.").

[4] The Court notes that Buschman has not demonstrated what extrinsic evidence he intends to introduce at trial so there is, at present, no challenge to the admissibility of any particular piece of extrinsic evidence. The Court advises both parties, however, that even where extrinsic evidence is permitted to aid in interpretation of a contract, evidence of the undisclosed subjective intent or expectations of the parties is not relevant for the interpretation of an agreement. *See, e.g.*, *Winet v. Price*, 4 Cal. App. 4th 1159, 1166 n.3 (1992).

**United States District Court**

For the Northern District of California

duties under the 1995 Agreement and the testimony of its CEO that AAI acted as Dr. Buschman's 'office' and administrative staff, handling billing and collections and other services." The Court concludes evidence relating to the 1996 Buschman Agreement[5] to be relevant extrinsic evidence as to the interpretation of the 1995 Agreement – including on the question of whether the individual NCAP physicians (such as Dr. Buschman) were intended third-party beneficiaries of the 1995 Agreement. As an arguable part of the course of conduct (as discussed below), the 1996 Buschman Agreement is probative of the parties' intent with respect to the 1995 Agreement.

As to the 2006 Agreement, ABC argues that the agreement is irrelevant because it was entered into *after* the alleged breach – the January 2006 cancellation and failure to notify Buschman of the cancellation. Buschman contends, pointing to deposition testimony of two former NCAP officers, that the "2006 Agreement was a more explicit memorialization of the duties AAI had assumed under the 1995 Agreement and had performed for NCAP and Dr. Buschman for over a decade." He further contends that the 2006 Agreement was itself breached by "AAI's and ABC's continued failure to notify Dr. Buschman of AAI's cancellation of his group disability policy from late 2006 until early 2012." Buschman has alleged in his complaint that the cancellation of the group-disability policy and failure to notify him of that cancellation breached both the 1995 Agreement and 2006 Agreement.[6]

As to the cancellation of the group-disability policy itself, Buschman may not base his breach of contract action on the 2006 Agreement. Under California law, as in all states, a breach of contract action requires that there be a contract in place that was allegedly breached by the defendant's actions. *See CFF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008).

---

[5] The parties also dispute the relevance of the 1996 Agreement between AAI and a Dr. Levinson. The parties argue that the Levinson contract is identical to the 1996 Buschman Agreement. The Levinson Agreement, however, was discussed during depositions because the actual 1996 Buschman Agreement was, at that time, not available. For purposes of this analysis, the Court treats the 1996 Buschman Agreement and 1996 Levinson Agreement identically.

[6] Buschman's desire to root the alleged breach in the 2006 Agreement appears to be based on the fact that the 2006 Agreement, unlike the 1995 Agreement, contains an attorneys' fees provision in Section 8.5 which states, in relevant part, "[i]n the event of any action to enforce any of the terms or conditions of this Agreement, the prevailing party in such action and appeal resulting therefrom shall be entitled to recover from the other party its attorneys' fees and costs." 2006 Agreement, art. 8, § 8.5.

United States District Court

For the Northern District of California

Here, the cancellation occurred 9 months before the 2006 Agreement was signed.  Accordingly, the cancellation could not have breached any duty imposed by the 2006 Agreement as it did not even exist at the time.

Buschman's argument that ABC breached the 2006 Agreement by continually failing to notify him of the cancellation is more complicated.  First, Buschman has offered deposition testimony of NCAP officers that suggests the 2006 Agreement was not a completely "new" but rather a "more explicit memorialization of all the duties AAI had assumed under the 1995 Agreement and had performed for over a decade."  *See* Deposition of Gershon Levinson ("Levinson Dep.") at 48 (Docket No. 29-1); Deposition of Craig Van Valkenburg ("Valkenburg Dep.") at 57 (witness stating that, with one exception, the 2006 Agreement provided for the same "financial services" as the 1995 Agreement).  Second, as with the 1995 Agreement, the 2006 Agreement is not only facially ambiguous as to whether AAI was required to provide notification to Buschman of the cancellation of his policy, but also whether this was a continuing obligation.  For example, the 2006 Agreement generally provides that AAI would provide, among other things:

- Preparation of monthly financial statements for Client and for the individual physician members of Client

- Production and mailing of Client-specific financial, pension, payroll and contractual documents

- Assistance provided to Client's insurance broker in selection and administration of group insurance options.

2006 Agreement, Ex. A, § A-1.4.  It is not clear on the face of the agreement that "administration of group insurance options" or "preparation of monthly financial statements" did not impose an obligation on ABC to notify the participating physicians of the nature and status of their group insurance coverage.

In light of the above, the Court cannot conclude on this record that Buschman cannot state a claim for breach of the 2006 Agreement based on AAI/ABC's failure to continuing notice of its cancellation of his group insurance policy.  Buschman is advised, however, of the burden of production he will need to satisfy to even potentially prevail on this claim.  It is not sufficient that he show the 2006 Agreement imposed a duty on AAI to notify participating physicians when their

United States District Court

For the Northern District of California

coverage was cancelled.  This duty, if it existed at all, was breached in January 2006 and constituted a breach of the 1995 Agreement as the 2006 Agreement did not exist.  Rather, Buschman must present sufficient evidence at trial from which the jury (or, if the evidence on this point is not disputed, the Court) could not only conclude that the *2006 Agreement* imposed a duty on AAI to notify him of the cancellation of his group disability insurance, but also that this duty was of a continuing nature such that AAI had a contractual duty to notify him of a cancellation *that had occurred nine months previously*.  At the pre-trial conference the Court expressed skepticism as to whether Buschman will be able to make this showing.  Buschman is forewarned that at the close of Buschman's case, if insufficient evidence has been presented on this point, the Court will, on motion or *sua sponte*, grant ABC judgment as a matter of law as to this theory.  *See Ervco, Inc. v. Texaco Refining and Marketing, Inc.*, 428 F. App'x 725 (9th Cir. 2011) (recognizing the power of a court to *sua sponte* grant a Rule 50 JMOL after the jury has heard the relevant evidence on the issue).

Finally, the Court notes that evidence relating to the 2006 Agreement may be used to aid in the interpretation of the 1995 Agreement.  As the 1995 Agreement is ambiguous for the reasons discussed above, extrinsic evidence may be used to interpret and give meaning to its ambiguous terms.  This extrinsic evidence may take the form of evidence regarding the parties' actions subsequent to the agreement.  *See Barham v. Barham*, 33 Cal. 2d 416, 423 (1949) ("Where any doubt exists as to the purport of the parties' dealings as expressed in the wording of their contract, the court may look to the circumstances surrounding its execution including the object, nature and subject matter of the agreement, *as well as to subsequent acts . . .* of the parties shedding light upon the question of their mutual intention at the time of contracting."); *see also Hartnell Comm. College Dist. v. Superior Court*, 124 Cal. App. 4th 1443 (2004) ("'[E]xtrinsic evidence is inadmissible to contradict a clear contract term, but if a term is ambiguous, its interpretation depends on the parties' intent . . . in light of earlier negotiations, later conduct, related agreements, and industry-wide custom.'" (quoting *Pace v. Honolulu Disposal Serv., Inc.*, 227 F.3d 1150, 1158 (9th Cir. 2000).

Testimony that the 2006 Agreement provided for the same services that AAI had provided under the 1995 Agreement (but provided a more explicit memorialization of those services) is relevant evidence of the course of dealing between AAI and NCAP and can therefore be used to

interpret the 1995 Agreement.  *See Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998) ("The

mutual intention as to which the courts give effect is determined by objective manifestations of the

parties' intent, including the words used in the agreement, as well as extrinsic evidence of such

objective matters as the surrounding circumstances under which the parties negotiated or entered

into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of

the parties."); *Cf. Heston v. Farmers Ins. Group*, 160 Cal. App. 3d 402 (1984) ("[E]vidence of the

actions of the parties subsequent to an inquiry because of an ambiguous contract may be considered

in interpreting an agreement . . . .").

   For the foregoing reasons, ABC's first motion in limine is **DENIED**.

B.  Motion in Limine No. 2: Admissibility of Evidence of "Other Acts" by ABC or AAI

   In its second motion in limine, ABC seeks to preclude Buschman from introducing evidence

of alleged "other acts" by ABC or AAI under Federal Rule of Evidence 403 or 404(b).  ABC argues

that Buschman seeks to introduce a number of exhibits that serve "no other purpose than to create

the impression that AAI and ABC were negligent as a matter of course, and to thereby cause the jury

to believe that AAI and ABC acted in conformity with its other 'negligent' acts with respect to

Plaintiff."  Docket No. 54.  ABC seeks to exclude seven exhibits propounded by Buschman on this

ground.

   1.  Legal Standard: Rule 404(b) and Rule 406

   Federal Rule of Evidence 404(b) generally provides that "[e]vidence of a crime, wrong, or

other act is not admissible to prove a person's character in order to show that on a particular

occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Other act

evidence, however, may be admissible – subject to Rule 403 – for "another purpose," including

"proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or

lack of accident."  Fed. R. Evid. 404(b)(2).  Applying this rule, courts have excluded evidence that a

defendant had acted negligently on a prior occasion when used to establish that the defendant was

negligent in any particular instance.  *See Sparks v. Gilley Trucking Co., Inc.*, 992 F.3d 50, 53 (4th

Cir. 1993) (finding evidence of defendant's prior speeding tickets because they "tended to show at

most a trait about Sparks, that he tended to speed, and to suggest that because he speeded on prior

United States District Court

For the Northern District of California

1    occasions, he was speeding at the time of the accident"); *Jones v. So. Pac. R.R.*, 962 F.2d 447, 449

2    (5th Cir. 1992) ("Haley's prior safety infractions had little to do with what actually happened on the

3    day of the wreck.  Such evidence was not admissible to show that Haley was negligent in conducting

4    the train.").

5           Federal Rule of Evidence 406, however, is a general exception to Rule 404(b)'s bar on the

6    use of evidence of prior actions to prove subsequent conduct in conformity therewith.  This rule

7    provides, in relevant part: "Evidence of a person's habit or an organization's routine practice may be

8    admitted to prove that on a particular occasion the person or organization acted in accordance with

9    the habit or routine practice."  Fed. R. Evid. 406.  The advisory committee notes, relying on

10   McCormick's evidence treatise, distinguishes "habit" from "character" by stating that while

11   character is a "generalized description of one's disposition, or of one's disposition in respect to a

12   general trait," habit is the "person's regular practice of meeting a particular kind of situation with a

13   specific type of conduct . . . .  The doing of the habitual acts may become semi-automatic."  Fed. R.

14   Evid. 406 committee note.

15          Courts have noted the difficulty in distinguishing between admissible evidence of habit and

16   inadmissible evidence of character.  *See Zubulake v. UBS Warburg LLC*, 382 F. Supp. 2d 536, 542

17   (S.D.N.Y. 2005).  Accordingly, in *Simplex, Inc. v. Diversified Energy Systems, Inc.*, 847 F.2d 1290

18   (7th Cir. 1988), the Seventh Circuit noted that it is "cautious in permitting the admission of habit or

19   pattern-of-conduct evidence . . . because it necessarily engenders the very real possibility that such

20   evidence will be used to establish a party's propensity to act in conformity with its general

21   character."  *Id.* at 1293.  It then held that "before a court may admit evidence of habit, the offering

22   party must establish the degree of specificity and frequency of uniform response that ensures more

23   than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semi-automatic' in

24   nature."  *Id.*  Finally, at least one district court has found that a where a party has introduced

25   evidence of its routine business practices, the opposing party is "entitled to present evidence of

26   instances" in which the party utilizing routine-practice evidence failed to follow its routine business

27   practices."  *Rowley v. American Airlines*, 885 F. Supp. 1406, 1413 (D. Or. 1995).

28

United States District Court

For the Northern District of California

1    With these principles in mind, the Court examines each proffered exhibit ABC has

2  challenged in its second motion in limine.

3        2.    Exhibit 6: 2007 Spreadsheet of Group Disability Insurance Participants Does Not

4              Constitute "Other Act" Evidence Under Rule 404(b)

5    Buschman's Exhibit 6 is a spreadsheet entitled "Northern California Anesthesia Physicians

6  2007 Long Term Disability" and establishes that it is in reference to "Policy No. 58106-001."

7  Docket No. 49-7.  This spreadsheet, despite being made in 2007 – approximately one year after AAI

8  had terminated his coverage under Policy No. 58106-001 – lists "Buschman, Alan" as being a

9  participant.  *Id.* at 2.  None of ABC's arguments as to why this document should be excluded

10  implicate Rule 404(b).  Rather, ABC argues that (1) the document is "inaccurate" since it is

11  "undisputed that Plaintiff was not a participant as of this date" and (2) it is unknown when, how, or

12  for what purpose this spreadsheet was prepared."  Docket No. 54.  These are not Rule 404(b)

13  arguments, and ABC's conclusory statement that it is being used for "no other purpose for

14  introducing this document other than as propensity evidence" does not make it so.

15    The relevance of this document is clear – if a document was created in 2007 reflecting the

16  author's (presumably an individual from AAI as it was produced from AAI's files) belief that

17  Buschman was a participant in the group-disability insurance policy, it makes it more likely that

18  Buschman was *supposed* to have been a participant in the policy, and, therefore, that the prior

19  cancellation of coverage was erroneous.  Also, if AAI had documents in its possession post-

20  cancellation suggesting that Buschman was, in fact, participating in the policy, it would support a

21  finding that AAI/ABC did not send Buschman notification that his cancellation was terminated.

22  Stated another way, Defendant's argument that this document should be inadmissible as it is

23  "inaccurate" misses the point – the document has relevance precisely because it is inaccurate.  This

24  is not a "propensity" argument – rather it is evidence tending to show that AAI made an error in

25  cancelling Buschman's coverage – the precise question involved in this action.  Defendant's

26  arguments that it is unclear who made the document, when, or for what purpose go to the *weight* of

27

28

1   the evidence not its admissibility.  Further, the Court notes that ABC, as the successor entity to AAI,

2   is in the best position to answer these questions.[7]

3        Accordingly, Defendant's objection to this document under Rule 404(b) is **OVERRULED**.

4   As discussed at the pre-trial conference, Buschman will be required to introduce this exhibit through

5   a witness with sufficient knowledge to articulate what this spreadsheet is so the jury is not left to

6   speculate as to the purpose of the spreadsheet.

7        3.   Exhibits 17 and 18[8]: E-Mail Exchange Between AAI and Group-Policy Participant

8            Dr. Gershon Levinson Will Not Be Excluded Under Rule 404(b)

9        Buschman's Exhibits 17 and 18 consist of an e-mail exchange between Dr. Gershon

10  Levinson – an NCAP physician – and AAI personnel relating to Dr. Levinson's personal disability

11  insurance policy.  Docket No. 49-8.  While not entirely clear, it appears that Dr. Levinson had not

12  received a letter that UNUM had sent to him (via AAI) regarding the effect of his 65th birthday on

13  his personal disability insurance coverage.  In April 2008, AAI informed Dr. Levinson that a letter

14  had been "sent to your attention (at our old address) in December [2007].  We are contacting carrier

15  to make sure they update addresses in all files and not just the billing address."  Docket No. 49-8, at

16  3.

17       Buschman argues that these exhibits are not "character" or "propensity" evidence but rather

18  relevant evidence to "rebut Defendant's claim that AAI and ABC complied with its own routine

19  procedures at all times."  Docket No. 54, at 15.  He further argues that the e-mail communication

20  "shows that AAI understood it had a duty to pass on material communications from UNUM to

21  NCAP's physicians, and that AAI acted as the communications conduit between UNUM and

22  NCAP's physicians."  *Id.*

---

25  [7] According to the joint exhibit list, ABC has stipulated to the fact that this spreadsheet is
26  both authentic and a business record – meaning that ABC has agreed that this document was created
    in the "ordinary course of business" – thus somewhat undermining its argument relating to the who,
    what, where, when, and why of this exhibit.

27  [8] In its motion in limine, Defendant refers to these as Exhibits 18 and 19.  Changes to the
28  exhibit list following service of the motion in limine altered the numbering of exhibits.  For purposes
    of this order, the Court uses the current exhibit numbers.

United States District Court
For the Northern District of California

The Court concludes that this evidence is not barred by Rule 404(b).  According to the parties' pre-trial conference statement, there are a number of disputed legal and factual issues, which include: (1) "[w]hether all communications from UNUM concerning the group long-term disbaility policy . . . were addressed to AAI personnel at AAI's or Defendant's business office, not to NCAP or any individual NCAP physician"; (2) "[w]hether NCAP and its physicians reasonably relied on AAI as the sole means to inform them of any communications from the insurer"; and (3) "[w]hether NCAP paid AAI to inform in writing its physicians of any material communications from the insurer UNUM."  Docket No. 67.  The exchange with Dr. Levinson supports a finding that AAI did, in fact, operate as a conduit for communications between UNUM and the participating physicians.  It further suggests that AAI personnel were aware that they had a duty to pass on comminations from UNUM to the participating physicians.  The exchange does this because: (1) the UNUM letter was directed to Dr. Levinson but was sent to AAI's business address; (2) upon locating the letter that had been sent four months earlier, AAI forwarded it to Dr. Levinson and stated that they were ensuring that UNUM updated *AAI's* address in all of its files – suggesting a recognition that letters regarding the insurance policies and coverage were properly sent to it, not the participating physicians.

For this reason, the Dr. Levinson exchange is relevant – it supports Buschman's argument that AAI/ABC had a duty to send communications relating to his insurance coverage to him, or at least did so as a matter of course such that he could rely on AAI/ABC to do so.  Similarly, the exhibits are relevant course of performance evidence which can be used to interpret AAI's duties under the 2006 Agreement and, perhaps, the 1995 Agreement.  *Cf. Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Group*, No. 94 CIV. 4725 (CSH), 1999 WL 11553 (S.D.N.Y. Jan. 13, 1999) (overruling Rule 404(b) objection as the documents in question were "at least somewhat probative of the contract's meaning").  These theories of relevance do not involve any improper propensity reasoning.  While there is the risk that the jury could use this evidence for that improper purpose (i.e., that it concludes that because AAI had failed to timely send a letter to one doctor on a separate occasion, they must have done so in this case), the Court concludes that probative value of the exchange is not substantially outweighed by this risk.  Further, the Court will, should ABC request it at trial, consider providing a limiting instruction to the jury.

**United States District Court**
For the Northern District of California

1    For the foregoing reason's ABC's Rule 404(b) objection to Exhibits 17 and 18 are

2  **OVERRULED**.

3         4.      Exhibits 42 and 43: NCAP Review Notes Will Be Excluded Under Rule 403

4    Buschman's Exhibits 42 and 43 are internal AAI documents apparently created after a

5  periodic review of the NCAP file.  Exhibit 42 is entitled "NCAP March Financial Review Notes"

6  from April 2004.  Docket No. 49-10.  This AAI internal document includes five action items relating

7  to outstanding checks, checks that had not cleared, or actions that needed to be taken with regards to

8  payroll.  For example, one entry provides: "Overhead Federal Provision needs to be reclassed to

9  clear out the Federal Income Tax Payable on the balance sheet ($2408).  Then you can drop the

10  description on the summary.  Sorry, I think I told you to post it to overhead."  Docket No. 49-10, at

11  2.  Exhibit 43 is a similar, though undated, document.  Docket No. 49-11.  This document contains

12  four action items, some of which appear to be corrections for previous incorrect acts.  For example,

13  for one doctor, the document states "On-call meals were posted to regular meals and ent.  Doesn't

14  change payroll but needs to be reclassed for tracking purposes."  Docket No. 49-11, at 2.

15    ABC contends that the only purpose for which Buschman seeks to use these documents is to

16  "highlight for the jury that AAI has made errors in the past."  Docket No. 54, at 6.  Buschman, by

17  contrast, that the exhibits are relevant to rebut ABC's defense that it "at all times sent accurate

18  payroll statements to NCAP's physicians  which properly detailed the amount of deductions for

19  insurance contributions."  Docket No. 54.  They further argue that the documents are relevant to

20  show that the "related services" provided by AAI under the 1995 Agreement were broad.  *Id.*

21    As the Court noted at the pre-trial conference, the Court does not view the admissibility of

22  these documents as a Rule 404(b) question, but rather a question of Rule 403.  The Court does not

23  believe prior instances of mistakes in administration of a corporate entities' policies and practices

24  can properly be said to be evidence of that entities' "character."  If, however, the incident in

25  question is factually distinct from the circumstances presented in this case (*i.e.*, involves different

26  conduct or different individuals) or lacks a sufficient temporal connection to the events underlying

27  this action, the probative value of that incident decreases, raising potential Rule 403 concerns given

28

United States District Court

For the Northern District of California

1   its potential prejudice in highlighting unrelated errors.  Additionally, the relevance of this evidence

2   depends, to an extent, on the defense put on by ABC.

3        Turning to Exhibits 42 and 43, to the extent Buschman argues that these exhibits are relevant

4   extrinsic evidence to show the nature of the services AAI provided to NCAP, the Court disagrees.

5   The parties have already stipulated that under the 1995 Agreement, AAI would handle the payment

6   of insurance policies from participating physicians' payroll checks.  Docket No. 67, at 6.  These two

7   documents do no more than show AAI performed payroll tasks for NACP and thus do not have any

8   independent probative value when compared to the stipulation.  Any slight marginal probative value

9   these exhibits have compared to the stipulations is substantially outweighed by the risk of needless

10  cumulative presentation of evidence.

11       Further, the Court finds that these exhibits' probative value is substantially outweighed by

12  the risk of juror confusion under Rule 403.  While Buschman argues that these documents challenge

13  the contention that ABC's payroll statements and financial reports were accurate, the exhibits only

14  speak of internal classifications of certain expenses (none of which involve insurance).  One of the

15  documents explicitly says that the change did not affect payroll, but merely needed to be changed for

16  tracking purposes.  Finally, the documents discuss small errors in 2004 – almost two years before

17  Buschman's group disability insurance was cancelled.  These errors appear to have little in common

18  with the allegedly erroneous termination of Buschman's group disability policy in 2006.  In these

19  circumstances, unless Buschman can show a plausible substantial connection with the 2006

20  termination, the Court finds the probative value of these documents to be very slight and the risk of

21  confusion of issues great, and they will be excluded under Rule 403.

22       5.   Plaintiff's Exhibits 57 and 58: Internal AAI Memoranda Identifying Insurance Policy

23            Administration Errors in January 2006 Will Not Be Excluded Under Rule 404(b)

24       Buschman's Exhibits 57 and 58 are memoranda dated April 19, 2006, and May 17, 2006,

25  respectively.  Docket Nos. 56-12; 56-13.  They were drafted by Amy Pratt and sent to NCAP and a

26  number of NCAP physicians.  Relevant for ABC's motion, these memoranda reveal errors in the

27  medical insurance bills for January, February, and March.  The April 19, 2006 memorandum states:

28  "The medical insurance bills for February & March premiums were incorrect.  I have determine the

23

1  amount paid and expended for January premiums was not correct.  This correction will be made on

2  the May 15th payroll."  Docket No. 56-12, at 2.  Similarly, the May 17, 2006 memorandum states: "I

3  have determined the amount paid and expensed for January medical insurance premiums was not

4  correct.  This correction will be made on the June 15th payroll."  Docket No. 56-13, at 2.

5       Defendant argues: (1) Buschman seeks to use these documents simply to show that ABC and

6  AAI had a "propensity for making mistakes"; (2) are irrelevant on the question as to whether ABC

7  "acted negligently with respect to Plaintiff's insurance coverage"; (3) and that the errors related to

8  the "amount paid and expensed" for health insurance premiums – a question distinct from removing

9  a participant from the group policy.  Accordingly, it contends that given the dissimilarities between

10  these exhibits and the question presented in this case, the jury will likely be confused by the exhibits

11  into concluding that AAI knew it erred in removing Buschman from the group coverage and failed

12  to correct it.  Buschman responds that these exhibits are highly relevant as they involve AAI errors

13  relating to the accuracy of its administration of insurance premiums in January 2006 – the same

14  month that his coverage was, allegedly, cancelled in error.

15       The Court will not exclude these exhibits under Rule 404(b).  As discussed above, the

16  admissibility of these documents is more properly reviewed under Rule 403.  Applying the Rule 403

17  standard, the Court finds that Exhibits 57 and 58 raise a close question of admissibility.  The

18  incidents referenced in these documents pertain to the same general subject (payment and

19  administration of insurance premiums) and have a temporal connection (January 2006) with the

20  incident that forms the basis of this action.  However, there is no foundation laid as of yet showing

21  the connection between these errors and the termination of Buschman's disability insurance (*e.g.*,

22  same AAI employees likely involved, there was an overarching practice that would have resulted in

23  all these errors, etc.).

24       For the foregoing reasons, ABC's objection to Exhibits 57 and 58 on Rule 404(b) grounds is

25  **OVERRULED**, but the Court reserves judgment on admissibility under Rule 403, depending on the

26  foundational evidence at trial.

27

28

United States District Court
For the Northern District of California

6. <u>Evidence Relating to the Missing 2006 Payroll File for Dr. Buschman</u>

ABC seeks to preclude Buschman from referencing the fact that the 2006 payroll file for Buschman cannot be located.  It argues that NCAP has not been an ABC client for years and that ABC sent its NCAP related files to NCAP's new practice management company – Abeo.  Docket No. 54, at 8.[9]  ABC contends that Buschman seeks to introduce the fact that this file is missing for no other reason than to "paint ABC and/or AAI in a bad light, that is, that ABC keeps sloppy records, is prone to making clerical mistakes and thus, must have acted negligently toward Plaintiff."  Docket No. 54, at 8.  Buschman responds by asserting that the fact that the file is missing and that there is no evidence of earnings or income statements showing the lack of group disability premium deductions is directly relevant to ABC's defense in this action.  *Id.* at 17.  He argues that ABC "cannot claim that it provided notice to Dr. Buschman in 2006, and also preclude Plaintiff from countering that *no such evidence exists*."  *Id.*

ABC's Rule 404(b) objection is **OVERRULED**.  Evidence that the 2006 payroll file – and thus the payroll documents that ABC contends put Buschman on notice that his insurance policy had been terminated – is missing is not "other act" evidence.  Rather it is simply highlighting the lack of documentary evidence to support ABC's defense that Buschman's payroll documents stopped deducting group-disability insurance premiums beginning in 2006.

However, the Court notes that the 2006 evidence is of reduced relevance given the fact that the payroll records for  2007, 2008, 2010, and 2011 – all years prior to Buschman's disability – will be introduced at trial.  Accordingly, even without the 2006 file, both parties are able to argue what the payroll records (and their deductions or lack thereof for insurance policy premiums) show.  Given the marginal probative value of the 2006 file in light of this other evidence, the Court will not permit Buschman to engage in any prolonged exposition or argument regarding the absence of this file.  Rather, he may elicit on a one time basis testimony from a proper witness that the 2006 file could not be located.

_____

[9] AAI's files on Buschman for the years 1997, 2007, 2008, 2010, and 2011 are listed on the exhibit list.

1   Finally, the parties will meet and confer and arrive at a stipulated limiting instruction that

2   clarifies the purposes for which this evidence may, and may not, be used.  The parties shall provide

3   the court with their stipulated limiting instruction no later than 3:00 p.m., Friday, September 5, 2014.

4          7.      Testimony by Dr. Levinson Regarding NCAP Audit of AAI

5         Finally, ABC seeks to exclude testimony or evidence relating to the fact that Dr. Gershon

6   Levinson – at the time the head of NCAP – hired an outside auditor to evaluate AAI's billing and

7   collection work.  Docket No. 54, at 8.  According to Dr. Levinson's deposition testimony, the

8   auditor came to the conclusion that

9       AAI had not been keeping up – keeping their computers current, so
10      that they would – for every insurance plan, they would program in
        how much they would anticipate receiving from the insurance
11      company, but then they would never update that number.  So that, as –
        as plans changed, if the insurance company mispaid a bill, AAI would
12      not know it with – with their system, and – and that – that's considered
        very, very poor procedure and very sloppy procedure.

13  Deposition of Gershon Levinson ("Levinson Dep.") at 74-75 (Docket No. 56-14).  ABC argues that

14  Buschman seeks to use this evidence to show that ABC or AAI generally kept sloppy records and

15  therefore must have been negligent in its cancelling Buschman's group-coverage.  Buschman

16  responds that it is "directly relevant to show the relationship of reliance and course of performance

17  between NCAP, its physicians, and AAI/ABC under the 1995, 1996, and 2006 written service

18  agreements."  Docket No. 54.

19        The Court reserves judgment whether this testimony should be excluded under Rule 403.

20  Evidence that ABC had, in the opinion of an auditor, "very poor" or "very sloppy" procedures in

21  their billing and collections department is of minimal relevance to the issue of this case unless, as

22  discussed above, Buschman can draw a plausible connection to the 2006 policy termination.  The

23  Court will exclude this testimony under Rule 403 if no such foundation is laid.

24  C.     Motion in Limine No. 3: Motion to Exclude Lay Opinion Testimony Regarding the Standard

25       of Care

26        In its final motion in limine, ABC seeks an order excluding any and all lay opinion evidence

27  or testimony regarding the standard of care that applies to ABC's or AAI's conduct.  Docket No. 55.

28  ABC contends that because the standard of care to which these entities should be held to as

United States District Court

For the Northern District of California

1  providers of "practice management services" is not within an ordinary person's common knowledge,

2  Buschman should be required to present expert testimony on this ground.

3       In California, a professional negligence claim "requires testimony of experts as to the

4  standard of care in the relevant community."  *U.S. Fidelity & Guar. Co. v. Lee Invest. LLC*, 641 F.3d

5  1126, 1138 (9th Cir. 2011) (citation omitted); *see also Sanchez v. Brooke*, 204 Cal. App. 4th 126,

6  138 (2012) ("Generally, expert testimony is required to establish the standard of care that applies to

7  a professional.").  Accordingly, California courts have required expert testimony to establish the

8  duty of care applicable to doctors, attorneys, insurance brokers, contractors, and the like in

9  negligence actions.  *See, e.g.*, *U.S. Fidelity*, 641 F.3d at 1138-39 (insurance brokers); *Avivi v. Centro*

10  *Medico Urgente Med. Ctr.*, 159 Cal. App. 4th 463 (2008) (medical malpractice action); *Wilkinson v.*

11  *Rives*, 116 Cal. App. 3d 641, 647 (1981) (attorneys); *Chaplis v. County of Monterey*, 97 Cal. App.

12  3d 249, 264 (1979) (general contractor).

13       However, even if it is assumed that AAI/ABC are "professionals" or provide "professional

14  services" for purposes of this rule, the expert testimony requirement is not absolute.  Rather, while

15  expert testimony is generally required in such cases,

16          an exception exists where the circumstances fall within the realm of
        common knowledge.  "In negligence cases arising from the rendering

17          of professional services, . . . the standard of care against which the
        professional's acts are measured remains a matter peculiarly within the

18          knowledge of experts.  Only their testimony can prove it, unless the
        lay person's common knowledge includes the conduct required by the

19          particular circumstances."

20  *Sanchez*, 204 Cal. App. 4th at 138 (quoting *Flowers v. Torrance Memorial Hospital Medical Center*,

21  8 Cal. 4th 992, 1001 (1994)).  Accordingly, the identity of the defendant as a professional is not

22  dispositive – rather the key question is whether evaluation of the defendant's acts or omissions in a

23  given case requires some form of specialized or scientific knowledge that only an expert can

24  provide.  *See id.* (expert testimony not required if a "lay person's common knowledge includes the

25  conduct required by the particular circumstances").

26       The California Supreme Court case of *Miller v. Los Angeles County Flood Control Dist.*, 8

27  Cal. 3d 689 (1973) provides a useful example of where expert testimony is, and is not, required in a

28  professional negligence action.  *Miller* involved allegations of negligence in the construction of a

United States District Court

For the Northern District of California

1    home, and the California Supreme Court held that, in general, expert testimony was needed to

2    determine whether the builder had complied with the relevant standard of care:

3           Building homes is a complicated activity.  The average layman has
            neither training nor experience in the construction industry and
4           oridinarily cannot determine whether a particular building has been
            built with the requisite skill and in accordance with the standards
5           prescribed by law or prevailing in the industry.  In the instant case, the
            issue as to whether or not the Miller home had been negligently
6           constructed involved a multitude of subsidiary questions bearing not
            only upon the erection of the structure itself but also upon the location
7           of the house on the particular lot, the elevation of the lot, the influence
            of the surrounding terrain, the possibility of run-offs and floods, and
8           the existence of the debris dam.  These were not questions which the
            jury could have resolved from their common experience . . . .

9

10   *Id.* at 702-03.  At the same time, the Court noted that certain acts by a contractor would not require

11   expert testimony such as "those failures on the part of the builder which are so obvious, if not

12   bizarre, that they present no problem in the determination of his negligence, as for example the

13   installation of a fireplace without a chimney or of a second floor without any means of access to it."

14   *Id.* at 702 n.15; *see also Aramyan v. United States*, CV 08-0360 MMM CWX, 2010 WL 532536, at

15   *22 (C.D. Cal. Feb. 8, 2010) ("[T]he standard of nonmedical, administrative, ministerial, or routine

16   care in a hospital need not be established by expert testimony because the jury is competent from its

17   own experience to determine and apply such a reasonable-care standard." (citation omitted));

18   *Friedman v. Dresel*, 139 Cal. App. 2d 333, 341 (1956) ("[W]here negligence on the part of a doctor

19   is demonstrated by facts which can be evaluated by resort to common knowledge, expert testimony

20   is not required since scientific enlightenment is not essential for the determination of an obvious

21   fact." (citation omitted)).  Accordingly, application of the common knowledge exception turns on

22   whether the alleged failures are sufficiently obvious that they pose "no problem" in determining

23   negligence.  *Miller*, 8 Cal. 3d at 702 n.15.

24          The Court concludes that the alleged negligent acts involved in this case do not require that

25   Buschman provide expert testimony to establish the standard of care.  Here it is alleged that

26   AAI/ABC wrongfully had his group-disability insurance coverage canceled without his consent and

27   then failed to inform him of this cancellation.  These allegations, particularly in light of the

28   allegations and evidence that NCAP and its member physicians relied on AAI/ABC to provide

United States District Court

For the Northern District of California

1   administrative tasks and to serve as the conduit for communications with UNUM, are not outside the

2   "common knowledge" of a lay individual.  *Cf. American Int'l Reocvery v. Allstate Ins. Co.*, No.

3   2009-P-0008, 2009 WL 4758823, at *3 (Ohio Ct. App. Dec. 11, 2009) ("It is a matter of common

4   knowledge that when insurance is cancelled, it is critical to timely notify the insured of the effective

5   date of that cancellation, especially if that cancellation occurs immediately.  The issues regarding

6   duty of care owed in the instant case are not of a complex nature involving industry standards or

7   policy interpretation."); *Schultz v. Bank of Am., N.A.*, 990 A.2d 1078, 1086-87 (recognizing that

8   expert testimony would not be needed to explain the standard of care in a case where "an attorney

9   fails to inform his client that he has terminated his representation of the client").  Determining

10  whether these acts meet the applicable standard of care does not require an evaluation of the

11  reasoned judgment of a professional the way that, for example, evaluating a doctor's treatment

12  decisions, a home builder's architectural designs, or a book-keeper's choice of accounting methods

13  would.  Nor do the alleged acts or omissions by AAI and ABC touch on highly technical or

14  scientific principles that are beyond the common understanding of jurors.

15        For the foregoing reasons, ABC's third motion in limine is **DENIED**.  The Court will neither

16  require Buschman to provide expert testimony on the standard of care in this case nor preclude

17  admission of lay opinion testimony on this issue.[10]

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26

27

28

[10] As discussed at the pre-trial conference, however, to the extent Buschman seeks to introduce evidence regarding the "industry standard practice," such evidence is outside the purview of lay witnesses and would require the testimony of an expert.

**United States District Court**
For the Northern District of California

## VII.   **PLAINTIFF'S MOTION IN LIMINE**

A.      Motion in Limine No. 1: Exclude Argument and Evidence That Defendant Is Not Liable for

Acts or Omissions of AAI

In his motion in limine, Buschman seeks to preclude ABC from arguing that it is not liable for the acts or omissions of AAI.  Docket No. 59.  Buschman had proffered the following stipulation, that ABC rejected: "As a the result of a merger of ABC and AAI in 2008, ABC would be responsible for any damages if you find that AAI was negligent or breached its contract with NCAP."  *Id.* at 1.  ABC agreed, in part, and offered the following counter-stipulation: "As the result of a merger of ABC and AAI in 2008, ABC would be responsible for any damages if you find that AAI was negligent or breached its contract with NCAP.  No claim is made that ABC itself did anything wrong.  The only claim is that ABC would be liable as the successor in interest to AAI as a result of the merger."  Docket No. 61-2, at 4.  It appears the central fact dividing the parties on this ground is the fact that Buschman alleges that ABC itself – by failing to notify Buschman of the earlier cancellation of his insurance coverage – engaged in conduct that constitutes negligence or breach of contract.  Accordingly, Buschman was unable to agree with the counter-stipulation statement that "No claim is made that ABC itself did anything wrong."

As a preliminary matter, ABC first argues in its opposition that Buschman's motion represents an untimely motion for summary judgment.  The Court finds this argument unpersuasive. The motion in limine is not seeking judgment as a matter of law on any of Buschman's claims. Rather, it is seeking to preclude specific arguments from being made at trial – arguments, which as described below – are not case dispositive.

Further, ABC argues that it has "consistently . . . contend[ed] that it is not liable for any damages suffered by Plaintiff as a result of AAI's conduct.  Instead ABC contends that Dr. Buschman himself is 'responsible for any damages even if AAI was negligent or breached its contract with NCAP.'"  Docket No. 59-1, at 4.  ABC contends that Buschman's motion in limine would "prevent ABC from making this argument."  *Id.*  The Court disagrees.  All Buschman's motion in limine holds is to the extent the jury finds that AAI engaged in negligent conduct or breached its contract and this conduct caused Buschman's injury, ABC is liable as AAI's successor

United States District Court

For the Northern District of California

1   in interest.  This would not prevent ABC from arguing that AAI's conduct was not the cause of

2   Buschman's injury, but rather Buschman's failure to mitigate or comparative negligence was the

3   cause.

4         The Court finds that, as a matter of law, ABC as the surviving entity of a merger involving

5   AAI is liable for the acts and omissions of AAI to the same extent as if ABC had performed those

6   acts.  In January 2008, AAI filed Articles of Merger with the Oregon Secretary of State.  Docket No.

7   60-1.[11]  The merger involved AAI and "AA Merger Corp.."  *Id.* at 3.  The "surviving corporation"

8   was named "Anesthesiologist Associated, Inc." – in other words, AAI.  *Id.*; *see also id.* at 7 (listing

9   that the "name and type of the business entity that will survive" is "Anesthesiologists Associated,

10   Inc., an Oregon corporation").  The Plan of Merger attached to and incorporated into the Articles of

11   Merger stated, in relevant part, that "the Surviving Corporation shall succeed and possess all the

12   properties, rights, privileges, immunities, powers, franchies and purposes, and *shall be subject to all*

13   *the duties, liabilities, debts, obligations, restrictions and disbilities*" of both AAI and AA Merger

14   Corp.  *Id.* at 7 (emphasis added).  Mr. Hamid Mirafzali signed the Articles of Merger on behalf of

15   "AA Merger Corp" – Mr. Mirafzali is an individual ABC has identified as being the trustee of

16   various trusts which constituted the membership of ABC.  *See* Docket No. 37.  Approximately one

17   year after the Articles of Merger were filed, AAI amended its articles of incorporation to rename the

18   corporation from AAI to ABC. Docket No. 60-2.  The amendment was again signed by Mr.

19   Mirafzali.

20         In its opposition, ABC contends that it is not "obligated to stipulate" regarding the effect of

21   the merger or "with whom liability for AAI's pre-merger conduct resides."  Docket No. 5901.

22   Rather, it contends that "Plaintiff is obligated to connect at least some of the dots on his own."  *Id.*

23   As detailed above, Plaintiff has "connected the dots" – it has shown that ABC is *the* surviving entity

24

25   ───────────────────

26         [11] Buschman has filed a request for judicial notice that includes, in relevant part, a copy of
   the Articles of Merger filed with the Oregon Secretary of State and a subsequent amendment of
   AAI's articles of incorporation.  Docket No. 60.  The request for judicial notice is **GRANTED**.

27   These documents are available on the website of the Oregon Secretary of State website.  *See, e.g.*,
   *Rhodes v. Sutter Health*, No. Civ. 2:12-0013 WBS DAD, 2012 WL 662462, at *3 (E.D. Cal. Feb. 28,

28   2012) ("Because the articles of incorporation of California corporations are public records filed with
   the Secretary of the State of California, the court may take judicial notice of items two and four.").

**United States District Court**

For the Northern District of California

1  resulting from the merger between AAI and "AA Merger Corp."[12]  ABC has wholly failed to

2  respond in any substantive way to this fact.

3       Under Oregon law, when a merger takes effect, "[a]ll obligations of each of the business

4  entities that were parties to the merger, including, without limitation, contractual, tort, statutory and

5  administrative obligations, are obligations of the surviving business entity."  Or. Rev. Stat. § 60.497.

6  California's Corporation Code law is materially similar.  *See* Cal. Corp. Code § 1107 ("Upon merger

7  . . . the surviving corporation . . . shall be subject to all the debts and liabilities of each in the same

8  manner as if the surviving corporation had itself incurred them.").  Here, the "surviving business

9  entity" or "surviving corporation" from the merger between AAI and AA Merger Corp. was AAI.  A

10  year later, AAI's name was changed to ABC.  In these circumstances, and as the Article of Merger

11  fully recognized, the surviving entity (AAI, which then changed its name to ABC) became "subject

12  to all the duties, liabilities, debts, obligations, restrictions and disabilities" of pre-merger AAI.  What

13  is more, ABC has wholly failed to substantively contest this point with any citation to or discussion

14  of relevant corporate legal principles.  Accordingly, as a matter of law, any act or omission by AAI

15  prior to the merger will be ascribed to ABC.

16       As stated above, ABC remains free to argue that AAI's acts or omissions were not negligent

17  and did not constitute a breach of any contract.  Further, ABC can argue that even if AAI was

18  negligent or breached either the 1995 or 2006 Agreement, it is Buschman's failure to mitigate his

19  damages (or his comparative negligence) that caused his damages.  ABC will not, however, be

20  permitted to introduce evidence or make argument that it should not be held liable simply because

21  ――――――――――――

22      [12] In its opposition, ABC also contends that it was ABC's parent company – Miramed Global
Services, Inc. – that merged with AAI.  Docket No. 59-1.  This is flatly contradicted by the Articles

23  of Merger and Merger Agreement.  The Merger Agreement, in defining the merger states:

24          At the Effective Time . . . subject to the terms and conditions of the
        Merger Agreement . . . by and among MiraMed Global Services,

25          Inc. . . . , Merger Subsidiary [AA Merger Corp.] and the Company
        [AAI] . . . *the Merger Subsidiary shall be merged with and into the*

26          *Company* . . . .

27  Docket No. 60-1, at 7 (emphasis added).  It is thus apparent that while MiraMed Global Services,
Inc. entered into a merger agreement and may have been the parent company of AA Merger Corp.

28  (the so called "Merger Subsidiary," *MiraMed* itself did not merge with AAI, but rather AA Merger
Corp. did.

the act or omission was done by AAI and rather than ABC.  Stated simply, the Court understands Buschman's motion in limine to stand for the proposition that ABC is liable for AAI's acts and omissions to the same extent and degree as if ABC itself had engaged in those actions.  For the reasons stated above, the Court agrees and, to this extent, Buschman's motion in limine is **GRANTED**.  The Court does not rule on whether ABC may be liable directly for failure to notify Buschman that the policy had previously been terminated.  That issue is discussed *supra*.

The parties shall meet and confer and arrive at a stipulation that reflects the effect of the AAI merger on this case as discussed above.  The parties shall file this stipulation with the Court no later than 3:00 p.m., Friday, September 5, 2014.

## VIII.    EXHIBITS & WITNESSES

The parties have filed a joint witness list that includes the following individuals (the party calling the witness is identified parenthetically):

1.    Dr. Alan Buschman – Plaintiff (both Plaintiff and Defendant)

2.    Dr. Gershon Levinson – President of NCAP during the relevant time and executed agreements with AAI and ABC. (Plaintiff)

3.    Craig Van Valkenburg – CEO of AAI from mid 1990s until the merger that created ABC in early 2008. (Plaintiff)

4.    Mary Cleve – AAI accountant at relevant time; cancelled Dr. Buschman's coverage (testifying by deposition) (both Plaintiff and Defendant)

5.    Representative of PRJ Insurance – (Plaintiff)

6.    ABC Representative – (Plaintiff)

7.    Bonnie Starr – AAI practice management group supervisor (Defendant)

The parties failed to provide an estimate of the length of testimony for each witness as required by this Court's pretrial order.  Docket No. 24, at 4.

The parties have filed an exhibit list that includes 150 items.  The parties, however, failed to comply with this Court's pretrial order in that they did not file a joint statement in which each side identified 15 bellwether exhibits for which they sought a ruling in advance of trial.  Docket No. 24, at 5.  The parties filed the required joint statement after a request was made by the Court.  Buschman

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    contends that ABC engaged in "gamesmanship" by providing him with his list of exhibits with only

2    90 minutes to spare before the deadline in question. The Court finds no evidence of gamesmanship

3    on the part of ABC and notes that Buschman did not request an extension of time to file the joint

4    statement. Further, the Court notes this would not have been an issue had the parties initially

5    complied with the Court's pre-trial order.

6       The Court rules as follows on the parties' bellwether exhibits:

7    A.     Exhibits Identified by Plaintiff for Advance Ruling

| Exhibit No. | Description of Document | Ruling |
|---|---|---|
| 108 | E-Mail between Buschman and individual at Abeo relating to lack of coverage under the group-disability policy. | Buschman's objection on relevance grounds is **SUSTAINED**. ABC has failed to articulate a theory of relevance for this document and the Court can locate none. Speculation in 2012 as to why the group-policy was cancelled in 2006 has no relevance to this action, particularly when the speculation is being made by someone who had no involvement in the 2006 cancellation. Further, a bookkeeper's statement that she was told by UNUM that Buschman had "other disability policies" that were terminated in the 1990s not only raises concerns regarding double-hearsay, but are of no relevance to the questions posed by this case.<br><br>In addition, the e-mail chain contains hearsay to the extent the participants in the e-mail are relating information they received through conversations with UNUM.<br><br>ABC has pointed to no admission in this exhibit by Buschman that is relevant to any issue in this case. |
| 109 | E-Mail between Buschman and individual at Abeo relating to the cancellation of group-disability policy. | Buschman's objection is **OVERRULED** in part and **SUSTAINED** in part.<br><br>This exhibit is relevant to Buschman's state of mind as it shows Buschman (1) asking if he terminated the group policy in writing; and (2) stating he did "not remember doing that and assumed [he] was still in the group policy." The admission by Buschman is not hearsay as it is an admission by a party opponent.<br><br>Everything after the first page, however, will be excluded. First, it is of minimal relevance to Buschman's state of mind. Second, the later e-mails in the chain contain the same impermissible speculation and hearsay as Exhibit 108. |

| Exhibit No. | Description of Document | Ruling |
|---|---|---|
| 133 | E-mail exchange between individuals in PRJ Insurance (NCAP's insurance broker) discussing how insurance premium deductions appear on pay stubs.<br><br>One individual tells a Mr. Lucas that the doctors "get an Income Statement which shows what is being deducted.  However, the categories are general.  There is a Disability Expense, and this would include the Paul Revere policy **and** the Unum policy for Dr. Buschman when he had them enforce [sic]."<br><br>Mr. Lucas replies that "Looks like Dr. Bushman [sic] should have or would have seen the deductions not taken [sic] for his Unum [sic]." | Buschman's objection is **SUSTAINED.**<br><br>Mr. Lucas' opinion that Buschman would have or should have seen that deductions were not being taken out of his paycheck is improper lay opinion.  Under Federal Rule of Evidence 701, a lay witness is permitted to testify as to an opinion that is "rationally based on the witness's perception."  Fed. R. Evid. 701(a).  This requires that the person giving the opinion have "first-hand knowledge or observation." *United States v. Lopez*, -- F.3d – , 2014 WL 3866089, at *8 (9th Cir. Aug. 7, 2014)<br><br>Here, Mr. Lucas' opinion is not based on his first-hand knowledge or observation. Rather, the e-mail exchange reveals he did *not* have first-hand knowledge even of the general practice of how deductions were displayed on financial statements and relied entirely on another party to explain it to him.  This is not a sufficient basis to allow his lay opinion testimony regarding Buschman to be admitted. *Cf. Hirst v. Inverness  Hotel Corp.*, 544 F.3d 212, 225 (3d Cir. 2008) (excluding lay opinion testimony not based on witness' own perception but rather through information obtained second-hand).<br><br>The additional portions of the e-mail are excluded as irrelevant.  That Abeo has a practice of sending financial statements showing what has been deducted is not relevant for purposes of this action which concerns AAI and ABC's practices during a different time period. |

United States District Court

For the Northern District of California

| Exhibit No. | Description of Document | Ruling |
|---|---|---|
| 116-119, 135-141 | Business Expense Reimbursement Vouchers filed by Dr. Buschman in the 2002, 2006, 2007, and 2008 | Buschman's objection is **OVERRULED**.

Buschman objects to these exhibits as irrelevant and unfairly prejudicial under Fed. R. Evid. 403. The Court disagrees. ABC intends to defend this action, in part, on the ground that Buschman knew, or should have known, that his group-disability insurance policy was cancelled in 2006 based on lack of any premium deductions for this policy appearing on his payroll records. Buschman's pre-trial filings suggest he intends to respond to this charge by suggesting (1) he did not "inspect routine records" to make sure ABC was correctly performing its payroll and accounting tasks and (2) it was not evident from the records that there were no group-disability premiums being deducted. For example, Buschman contends that only a "close inspection" of the post-2006 payroll records would have caught the error and Buschman "had no compelling reason" to do this close inspection. Buschman's answer to ABC's defense inherently turns on the jury's view of his credibility.

The reason these records are relevant is that a jury could infer from Buschman's detailed expense reimbursement requests (for example, requesting reimbursement for $7.19 spent at Noah's Bagels on December 16, 2002 or requesting reimbursement in the amount of $847.00 for a $3.85 cup of coffee 5 days a week for 44 weeks) that he was extremely conscious of his income and the importance of maintaining accurate records. This is relevant information for the jury to evaluate Buschman's contentions that he did not know there was something ami§ with his insurance coverage based on the payroll reports he received.

The parties are instructed to meet and confer regarding appropriate redactions to these exhibits to (1) redact personal identifying information and (2) to the extent the exhibits constitute credit card bills, redact all but the relevant entries. |

B.      Exhibits Identified by Defendants for Advance Ruling

| Exhibit No. | Description of Document | Ruling |
|---|---|---|
| 9, 10, 62 | Exhibits 9 and 10 are e-mails and letter exchanges between counsel in this matter relating to discovery of the copy of contracts that had been "mis-filed" in an "active" clients binder.  Upon discovery, they were produced to Buschman.<br><br>Exhibit 62 is a demand for indemnification ABC served on Buschman as a former shareholder of pre-merger AAI. | ABC's objections are **SUSTAINED**.<br><br>Plaintiff argues that Exhibits 9 and 10 are needed to (1) explain why, in deposition testimony, the witness only spoke of these agreements "in absentia"(2) the fact that ABC had copies of these agreements is relevant to show that ABC is, in fact, the successor of AAI.<br><br>The Court concludes that these exhibits are not needed for either purpose.  First, the parties are **ORDERED** to meet and confer and arrive at a stipulation to be read to the jury that will address Buschman's concerns regarding the manner in which the agreements were discussed at the depositions.  Said stipulation shall be filed by 3:00 p.m., September 5, 2014.<br><br>Second, as discussed in granting Buschman's motion in limine, ABC will not be permitted to argue that it is not the successor to AAI.  For this reason, Exhibit 62 – which Plaintiff alleges supports a finding that ABC was the successor to AAI – is likewise unnecessary.<br><br>To the extent that Buschman contends that ABC's demand for indemnification is relevant to show "Defendant's misconduct or contradictory statemetns during the course of the litigation," the Court will exclude the exhibit under Rule 403.  Explaining the nature of an indemnification demand, the relationship between Buschman as shareholder to pre-merger AAI, and pre-merger AAI's relationship to ABC would create a mini-trial as to the propriety of the indemnification demand and waste substantial trial time.  Further, the jury is not the proper forum for airing grievances about opposing counsel's actions during the pendency of this suit.  As ruled above, Buschman will not be able to seek non-economic damages for wrongful litigation conduct in this trial. |

| Exhibit No. | Description of Document | Ruling |
|---|---|---|
| 19 | 2003 E-mail exchange between an AAI administrator and a representative of Hover Insurance Services addressing a question regarding the process for the cancellation of the group-disability insurance policy.<br><br>Insurance representative informs the AAI administrator that employees can opt of the coverage "at any time" but "we will need an official letter from the employee requesting refusal of coverage with and [sic] effective date." | ABC objects to this exhibit on relevance grounds stating that there is "no evidence" that Hover was NCAP's insurance broker in January 2006 (when Buschman's coverage was cancelled) and thus its internal policies in 2003 (or at any other time) are irrelevant.  They also argue the statement regarding needing an official letter is hearsay to the extent that it is being offered to prove that Hover required a letter by the employee to terminate coverage.  Finally, ABC argues the document will confuse the jury by causing them to conflate the internal practice of one insurance broker with *AAI*'s duties (either in contract or tort) as a project management services provider.<br><br>Buschman responds that the letter is relevant to show "what AAI and ABC were told about the appropriate and standard practices in the brokerage industry and the cancellation of coverage" and that it is not hearsay because it is being used to show "AAI's understanding of its own obligations under the relevant agreements."<br><br>ABC's objection is **OVERRULED**.  The exhibit reflects AAI inquiring with their insurance broker in response to a question from Buschman about whether the group-disability insurance policy could be cancelled at any time.  It further shows the insurance broker informing AAI that a formal letter from the client is needed.  This concerns the very group disability insurance at issue in this case.  The Court concludes this exhibit is relevant and the risk of unfair prejudice is minimal. |

**United States District Court**
For the Northern District of California

| Exhibit No. | Description of Document | Ruling |
|---|---|---|
| 20-29 | E-mails between Buschman and abeo in 2012 when Buschman contends he discovered he was no longer covered by the group-disability insurance | ABC's objection is **SUSTAINED** to the extent it seeks to prohibit introduction of third-party statements for the truth of the matter asserted.<br><br>This e-mail exchange is plainly relevant and ABC does not contend otherwise.  However, ABC correctly points out that the e-mail string includes a number of exchanges between third-parties which constitute hearsay.<br><br>The objection is **OVERRULED**, however, to the extent that were e-mails sent directly to or from Buschman.  Such e-mails are admissible.  Further down the e-mail chain, however, exchanges between third parties will are excluded as hearsay unless and until Buschman is able to articulate a non-hearsay purpose or applicable hearsay exception and not excludable under Rule 403.  E-mail exchanges down the chain have little, if any, probative value as to Buschman's relevant state of mind. |

United States District Court

For the Northern District of California

| Exhibit No. | Description of Document | Ruling |
|---|---|---|
| 51 | Handwritten Notes by Buschman relating to discussions regarding policy termination | ABC's objection is **SUSTAINED** in part and **OVERRULED** in part contingent on Buschman laying a sufficient foundation.<br><br>ABC argues that this exhibit – reflecting Buschman's notes of conversations he had regarding the cancellation of his coverage.<br><br>Page one of Exhibit 51 appears to be notes taken of a conversation with Barbara Starr – an ABC representative.  So long as Buschman is able to lay a proper foundation for application of the present sense impression hearsay exception for the notes themselves, the memorialization of Ms. Starr's comments would not constitute hearsay as they would constitute an admission by a party opponent. *See , e.g., Alexander v. Boeing Co.*, C13-1369 RAJ, 2014 WL 3900574 (W.D. Wash. Aug. 11, 2014) (admitting notes of conservation with party opponent); *see also United States v. Perl*, 492 F. App'x 37, 40 (11th Cir. 2012) (affirming introduction of  notes of telephone calls where there was "sufficient evidence for the district court to conclude that [the] notes were taken contemporaneously with the telephone conversations").<br><br>The second half of the second page of this exhibit contains notes of a phone conversation between Buschman and Debbie Tolle – an Abeo project management services request.  The notes appear to show Ms. Tolle opining on what ABC should have done when they cancelled. This portion of the exhibit will be redacted.  Ms. Tolle's speculation as to what occurred in 2006 is irrelevant.  The conversation is also hearsay since Abeo is not a party. |

## IX.   JURY VOIR DIRE, JURY INSTRUCTIONS, & VERDICT FORM

A.    Jury Questionnaire and Voir Dire

The Court shall not use a jury questionnaire but shall voir dire the potential jurors (taking into account the proposed voir dire submitted by the parties).  The Court has already described in its last Case Management Conference order the list of standard questions it intends to ask.  *See* Docket No. 24, a 9.  The Court shall also give each party twenty minutes to voir dire the potential jurors after questioning by the Court.

**United States District Court**
For the Northern District of California

B.      Jury Instructions

The Court shall provide the parties with the Court's proposed jury instructions in advance of the first day of trial and will schedule a process for comments and resolution of any disputes.

C.      Verdict Form

The Court will review the proposed verdict forms and provide a final verdict form before the close of evidence.

Attached to this order are the Court's guidelines for trial in civil cases.


IT IS SO ORDERED.


Dated:  August 29, 2014

_____
EDWARD M. CHEN
United States District Judge