Pages 1 – 76

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

| | |
|---|---|
| ALAN BUSCHMAN, )<br>)<br>        Plaintiff, )<br>)<br>  VS. )<br>)<br>ANESTHESIA BUSINESS CONSULTANTS, )<br>LLC, )<br>)<br>        Defendant. )<br>_____) | NO. C 13–1787 EMC<br><br>San Francisco, California<br>Tuesday<br>August 26, 2014<br>2:34 p.m. |

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:        MORGAN LEWIS AND BOCKIUS
                          One Market Street
                          Spear Tower
                          San Francisco, California  94105
               BY:  MICHAEL ERIC MOLLAND, ESQ.
                    AMY JO TALARICO, ESQ.

For Defendant:        KRIEG KELLER SLOAN
                            REILLEY & ROMAN, LLP
                          555 Montgomery Street
                          Seventeenth Floor
                          San Francisco, California  94111
               BY:  KENNETH E. KELLER, ESQ.
                    GARTH AARON ROSENGREN, ESQ.

Reported by:          BELLE BALL, CSR #8785, RDR, CRR
                          Official Reporter, U.S. District Court

**TUESDAY, AUGUST 26, 2014**                                    **2:34 P.M.**

**P R O C E E D I N G S**

**THE CLERK:** Calling Civil Case No. 13-1787, Alan Buschman versus Anesthesia Business Consultants, LLC.

Counsel, please come forward and state your appearances.

**MR. MOLLAND:** Michael Molland for Alan Buschman, Your Honor.

**THE COURT:** All right. Thank you, Mr. Molland.

**MS. TALARICO:** Good afternoon, Your Honor. Amy Talarico for Plaintiff Alan Buschman.

**THE COURT:** All right, thank you, Ms. Talarico

**MR. KELLER:** Good afternoon, Your Honor. Ken Keller for the Defendant.

**THE COURT:** Good afternoon, Mr. Keller.

**MR. ROSENGREN:** Good afternoon, Your Honor. Garth Rosengren for Defendant.

**THE COURT:** All right. Thank you, Mr. Rosengren.

You all -- let me just start off by affirming that you do have a settlement conference that is scheduled before Judge Laporte; is that right?

**MR. MOLLAND:** The afternoon of the 2nd, Your Honor, before Magistrate Laporte.

**THE COURT:** All right. It is my hope that after we get through this process today, and I issue my pretrial order with rulings on various matters and defining clearly the scope

of this case and the kind of evidence that's going to come in, that your assessment of the litigation risks will be clearer, clearer than it is today.  And then that will, hopefully, facilitate further resolution or discussion.

So, let's talk about this case.  Have a seat, and you can come up when it is appropriate.  Let me make a couple of overarching comments and questions I have with respect to this case.

First of all, with respect to the breach-of-contract claim, my understanding is that what is asserted now is a contract that is -- the basis for the breach-of-contract claim is the 1995 agreement and the 2006 agreement.

Right?

MR. MOLLAND:  With amendments following 2006, Your Honor.

(Reporter interruption)

MR. MOLLAND:  Correct, with -- the 2006 agreement was amended, briefly, in 2008, and 2011 as well.  So those four amendments to it, which are, I think, a page or so each, would also be a part of the 2006 contract.  That forms the basis of the claims, Your Honor.

There are also 1996 contracts between Plaintiff and the president of NCAP with Defendant, which are not the basis of the claims, but are -- would form a basis of one of the rebuttal arguments to the defenses.

**THE COURT:**  Right.  You want to introduce it as evidence, extrinsic evidence, perhaps, of perhaps third-party beneficiary theory.

**MR. MOLLAND:**  Both third-party beneficiary theory, as well, it would rebut -- the defense claim here is that there was no reason to essentially trust Defendant, and that the Plaintiff is either comparatively at fault, or failed to mitigate damages after knowledge of the breach.

And, a defense to that is:  "Look, this -- the Defendant basically was my office; handled all my affairs."

And as proof of that, some proof of that would be the 1996 contracts which, in fact, establish a business relationship between Plaintiff Alan Buschman and Defendant, to take care of his business.  To bill all his money, to collect his money, and pay him.

And, that's what the 1996 contract is all about.

**THE COURT:**  All right.  Well, let me make a comment about the 2006.

I understand your breach theory is sort of a duty to inform at that point, because the breach had already occurred.

**MR. MOLLAND:**  Correct, Your Honor.

**THE COURT:**  The cancellation.  And I think, as the Defendant phrased it, it's almost a duty of audit or something to kind of tell your client that, A, "By the way, you know you don't have any disability insurance under this group policy."

It's a duty to inform.

**MR. MOLLAND:**  Well, it's more than that, Your Honor. The duty is to say that: "We canceled your insurance."  Not so much to inform as to whether or not he had it, but to tell -- once -- the theory would be there was contractural duty, as well as a duty of care.

If, if, in fact, we are correct and the disability policy was canceled without consent, then there was a duty under contract and also a duty of reasonable care to tell Dr. Buschman it was canceled.

And therefore, that is a breach of contract of the 1995 agreement, of the 2006 agreement, and continuing thereafter.

**THE COURT:**  That cancellation occurred in February.

**MR. MOLLAND:**  February, 2006, Your Honor.

**THE COURT:**  And the new contract was in November.

**MR. MOLLAND:**  The written --

**THE COURT:**  The 2006 contract.

**MR. MOLLAND:**  It was in November, 2006, Your Honor.

**THE COURT:**  Right.  So you're saying nine months -- is it nine?  Yeah, eleven minus two, nine months later, after the fact, when a new contract was entered into, there is a duty to say "Oh, by the way, you know that nine months ago, your -- your group disability policy was terminated."

**MR. MOLLAND:**  Correct, Your Honor.  And I don't think the -- the defense here is -- largely the defense is -- two

defenses.  One, Alan Buschman:  "You told us to cancel it, and you're lying if you say you didn't"quote"  Okay, that's one defense.

And the other defense is:  "Okay, we canceled it without your consent, but we gave you notice that you weren't getting the disability policy.  And we did so under our duty to inform you in both the 1995 contract and the 2006 contract."

And in fact, the defense -- the major defense in the case is there were 77 different notices sent out by AAI and ABC, from 2006 up until 2007.

All these notices were sent pursuant to contractural obligations.  One, under the 1995 contract, until November, 2006.  And thereafter, over 60 notices were sent out under the duty of the Defendant under the 2006 contract.

What we're saying is since the defense acknowledges there was a duty to notify, and in fact, it did give notice for over six years, we are saying that was insufficient notice under both the 1995 contract and the 2006 contract.

And, in addition, it was insufficient notice as -- with respect to a duty of care.

**THE COURT:**  Where in the 2006 contract do you pin this breach?  Is there a paragraph in here?

**MR. MOLLAND:**  There is a duty -- the 2006 contract provides for a duty to maintain insurance policies, make payments, under the insurance policies.  It's very specific

that insurance policies are part of the ckckpractice maximum amount duties under the 2006 contract.

And the testimony of the witnesses, including the CEO of the Defendant -- not -- not -- not NCAP, but the Defendant will so testify.

**THE COURT:**  Well, yeah, but by that point it had already been terminated.  And that may be at fault for whoever did it back in February.  I don't understand how that gives rise to a claim to a new contract which did not go into effect until nine months later, that talks about processing and payment.  This is A-1.4 on Page 9.

**MR. MOLLAND:**  Right.

**THE COURT:**  Says "processing and payment of client expenses, including insurance premiums."

Well, processing and paying is one thing.  There was nothing processed or paid, because it had been canceled.  Rightfully or wrongfully, it had been canceled.

There's nothing in here about duty to advise it's not a good idea to go without insurance, or -- I just don't see it.

**MR. MOLLAND:**  Well, Your Honor, the term of what -- the term in there which provides that the Defendant had a duty to handle and maintain the insurance policies and payroll payments for Dr. Buschman and NCAP physicians is reasonably susceptible to the interpretation that there was a continued duty to notify Dr. Buschman of cancellations of insurance so

he would know whether or not it had been canceled.

THE COURT: How long would that duty exist? Let's say this contract wasn't entered into until 2007 or 2008. Would your argument be the same?

MR. MOLLAND: If the contract had not been entered into in 2008?

THE COURT: Yeah.

MR. MOLLAND: I'm not sure, Your Honor. I didn't really consider it. Because there is a 2007 document -- a 2007 document, in other words, it post-dates the contract -- which show -- written by the Defendant (Indicating), which shows that Dr. Buschman was, in fact, enrolled in the group disability policy.

I used that as the primary basis to argue and to maintain that there was a duty to inform Dr. Buschman of the cancellation. Since we have a document --

THE COURT: Well, that document is relevant because it suggests that everybody thought he was still insured. I mean, there was no intent to terminate, at least certainly on his part.

Isn't that the relevance of that 2008 document?

MR. MOLLAND: No, absolutely not, Your Honor. The relevance of that document shows not that he was enrolled in the group disability policy in 2007. He clearly was not. He had been canceled. It shows that there were some people at

AAI, at the Defendant, who thought he was still enrolled.

It goes to two issues.  When the Defendant says, as they do say, "Dr. Buschman canceled this himself, and we followed our ordinary practices in canceling his insurance in 2006," it shows that there were some people at AAI who didn't think he'd canceled it at all.

**THE COURT:**  And how is that relevant?

**MR. MOLLAND:**  It rebuts the defense that Alan Buschman canceled the policy himself.

**THE COURT:**  I thought I just said that, that it suggests that in fact he did not cancel, he did not issue a notice to AAI saying cancel it, because everybody would have known it.

**MR. MOLLAND:**  Well, it suggests that he didn't give notice, that's correct.  It certainly doesn't suggest that it was canceled because it certainly was canceled.

**THE COURT:**  Right.  It wasn't him who notified --

**MR. MOLLAND:**  Correct.

**THE COURT:**  -- AAI, the message clearly did not go out, the inference is drawn that somebody made a mistake in AAI since everybody else thought he was still on it, somebody goofed up.

**MR. MOLLAND:**  Correct.  It also shows that there were some people in 2007 that thought that Dr. Buschman was still enrolled.

Now, later on, they determined he wasn't.  It's pretty clear in 2008 and 2009, they understood he was not enrolled.  Because there are other documents show that other -- spreadsheets that show that he was not on the policy in 2008 and 2009.

At some point, somebody at that company became aware -- sometime after 2007 -- the whole company became aware, he did not have that insurance.  And that is when they -- at least by that point, some time after 2007, he should have gotten notice.

In response to Your Honor's question, if the contract had existed in 2008 and 2006, would we be maintaining this theory, I'm not we would, because of that 2007 document.

**THE COURT:**  Well, I'm not -- I guess I'm not seeing a connection between the fact that some people thought he was still at AAI, still thought he was enrolled, how that informs what the scope of the contract in 2006 was and what the duties under that contract were.

**MR. MOLLAND:**  Sure.  Well, if Your Honor's assumption is that the 2006 contract did not provide for -- in other words, wouldn't -- did not provide for re: duty such that AAI or the Defendant had canceled the insurance, that they were directly -- that they were responsible for telling Dr. Buschman they had canceled his insurance.  If the assumption was the 2006 contract did not -- did not -- provide

for that duty.

In other words, they could cancel the -- under the 2006 policy, Defendant was free to cancel Dr. Buschman's insurance without his consent, and not tell him directly.  If that's the -- if the --

**THE COURT:**  No, I think -- I thought what I was perceiving was that what happened in 2000 -- if it happened in February, under the governing contract at that time, there's an argument that, number one, it was a wrongful termination, not exercise of due diligence, et cetera, et cetera.  And, failure to notify at that time.

I'm saying the nine-month gap to say, signing new contracts, "Oh, by the way, we didn't tell you then but we should have told you now," I'm not sure -- seems like that duty to notify is concomitant with the cancellation.  It should have occurred in February.

**MR. MOLLAND:**  So the argument that we would make, Your Honor, on this, is that the duty to notify did not terminate any set time, 30 days, 40 days, two weeks after the cancellation.  It continued for a reasonable amount of time.

It's clear that people in 2007, at -- after the Defendant thought he was still enrolled in the policy, when he wasn't, and that at some point during this period of time -- it's a fact for the jury to determine whether or not notice was adequately given either under the 1995 contract or the 2006

contract.

And whether that extended for a year or two years or three years I think is a jury question. And we certainly will have testimony from the CEO of the Defendant, itself, saying that there was such a duty.

THE COURT: That's a question of fact. So that's the answer to my 2008 question. That's the difference, the temporal -- at some point, that duty dissipates.

I mean, you would admit it wouldn't go on --

MR. MOLLAND: At some point -- excuse me, Your Honor. I didn't mean to interrupt.

THE COURT: -- *ad infinitum*.

MR. MOLLAND: Yes, yes.

THE COURT: All right. Let me hear your thoughts, Mr. Keller.

MR. KELLER: Yes, Your Honor.

The problem I have with this argument is, one, it's never been articulated, until recently. But more importantly, Counsel said under the 2006 contract there's a duty to maintain Dr. Buschman's insurance.

I've looked at the 2006 contract. I've read every provision of it. I've read it right now. There is -- there is no such duty -- there's no such obligation set forth in that contract, that I can find.

And if Counsel can find it for me, that would be great.

Because, it does not say there is a duty to maintain his insurance.

It says there is a duty -- says they will process --

(As read):

> "Processing and payment of client expenses including insurance premiums, employee benefits and general business expenses."

That's what it says. So, they are creating a duty under this contract that there's certainly no reasonable --

**THE COURT:** Well, you made the same argument with respect to 1995. It's even less specific. Says nothing about insurance.

**MR. KELLER:** Well, absolutely. But as Your Honor points out, we have conduct that occurs in February of 2006. And, that's the case I think we're here to try, whether that conduct breached some duty under the 1995 contract or not.

What they're now attempting to do is to extend that duty, and the standard of care, to a post-incident contract. And you have to find the duty in that contract. And it does not exist.

So, it's great for Counsel to argue, "Well, this duty kind of continues for some period of time, and then it dissipates." But, there -- there is no such duty to go back in to give continuing notice -- and that is why I listened carefully to what he was trying to articulate what is this supposed duty

under the 2006 contract.  It's not there.  It is an obligation to process premium payments.

Those premium payments were processed back in two- -- well, February of 2006.  We have a dispute whether there was instruction to do so or not.  And then we have this issue about notice.

Counsel says that we've agreed that there is a duty under the 2006 contract to give notice to Dr. Buschman?  We have never said that.  We have never contended that; we've never said that in response to anything.

It's been in response, when they say he did not get notice, we say, "Well, we -- part of what we do is we prepare payroll statements to you.  You've been getting payroll statements for, since 1993, I think.  You certainly were getting payroll statements in 2003.  And those continued on.  Those would give you notice."

But there's absolutely no duty in this case established by any witness -- certainly no expert -- that there is some duty to give affirmative notice, direct notice, which is the type of notice they're now talking about.  So I -- I take exception with the concept that somehow --

**THE COURT:**  Well, is it your argument that there is no breach?  Even if the contract had been -- the disability policy had been terminated mistakenly without authorization, is it your position that that would not be a breach -- and

Mr. Buschman -- or Dr. Buschman wasn't notified of it.

Is it your position that that would not be a breach of the 1995 agreement?

**MR. KELLER:**  If we terminated it without some instruction from him, I think that would be a breach.  We have an issue about whether or not he gave us instruction.  And then there is the question whether it's mitigation or comparative fault --

**THE COURT:**  Yeah, I understand that.

**MR. KELLER:**  Right.  But we're here, one of the issues to be tried in this case is:  Why did she cancel it?  I mean she has no incentive.  We have argued this in summary judgment.

She has no incentive to come in and cancel Dr. Buschman on that day.  There's no evidence that some other doctor should have been canceled and she made a mistake.  She's testified, "No, I intentionally, I wrote Dr. Buschman's name there."

**THE COURT:**  I understand that.  Would you concede that part of the breach, if it was unauthorized and it was done without direction, somehow by mistake or whatever, that not only the termination, itself, but the failure to notify Dr. Buschman was -- was a breach of the 1995 agreement?

**MR. KELLER:**  I don't think there is a duty to notify.  This is not a -- this is not a situation like a statutorily-imposed duty for life insurance, where the

insurance company sends out a notice saying, "You didn't pay your premium; you've got 30 days; if you don't do it then we're really going to cancel."

This is group disability insurance.  There is no duty that they can point to under any statute, regulation, authority of any kind, that there is a duty to notify that we have canceled your policy.  Because, the policyholder actually is the end game.  That's the insured.

The issue with these group policies is people come and go under the policies all the time.  There's no duty that I'm aware of, and they certainly don't have an expert who is going to say that there is a duty to give direct or affirmative notice to --

**THE COURT:**  Let me ask you, this duty to notify that you say exists in 2006, as I assume you say existed in the 1995 agreement, where is that?  What's the source of that duty?

There's a duty not to terminate, mistakenly.

**MR. MOLLAND:**  If the duty -- if there is a duty to take care of -- let's assume that there is a duty as Counsel admitted, not to cancel a policy without consent.

However, if you can do that, and breach the contract, and not -- and there's no contractual duty to tell the person that you canceled without his consent, the duty under the contract has no meaning and has no benefit of the bargain for the

people that contracted.  They contracted and trusted this contracting party --

**THE COURT:**  Well, I know there is a substantive duty not to cancel without my permission.  If you cancel and you don't tell me about it and I find out about it later, there is a very meaningful duty.  You breach that duty, and I'm going to sue you for all the consequential damages that flow from that.  So, I wouldn't say it's unconsequential.

It may be a little more difficult to know about, and it may inform the duty to mitigate.  Because if you don't know about it, how can you mitigate?

Of course, the argument is that you knew through payroll statements, but, you know, that may inform -- it may be smart to inform the insured, but I'm not sure that -- I'm just trying to see, where in this contract do you find not only just the duty to maintain without -- you know, not to terminate without permission, but then to notify?  Is that just implicit as part of the --

**MR. MOLLAND:**  A, I would say it's implicit.  B, we have witnesses who will say that was part of the contract.  Including the CEO of the Defendant, himself.  Okay.

So, I mean, I think that the -- in the 1995 contract, the four- or five-page document, never produced during discovery, withheld by the Defendant during discovery, given to the Court in April or so after the summary-judgment motion had been

filed and discovery closed.  That contract was about four pages long.  It is a very vague contract.  It talks about -- it defines "practice management services" to include certain services.

And, the testimony of that -- that Dr. Buschman would seek permission of the Court to put on would explain what the contractual duties of practice management were under that contract.  They would deal with the course of performance of the parties for over 20 years in performing practice management duties.  That was --

**THE COURT:**  And course of conduct included giving notice when --

**MR. MOLLAND:**  Giving notice, absolutely, Your Honor, for significant -- for significant changes to the -- to the duty to practice -- practice management duties, to significant changes, to significant events, notice was given as -- in the course of performance by this Defendant (Indicating), to NCAP and to Dr. Buschman.

That will be the testimony, consistent testimony of the course of performance, under --

**THE COURT:**  Is there any evidence that notice was given nine months after a significant event?

**MR. MOLLAND:**  I think there's a -- there was a -- yes, I think there was some dust-up that happened between Dr. Levinson and the Defendant, I think it was in 2008, as a

matter of fact, where he complained about notice not being given, notice finally was given. Several months after the fact, Your Honor. Whether it was go eight or whether it was others, I can't remember. But, it was certainly a significant period of time after which the notice should have been of given.

MR. KELLER: Your Honor, I know Counsel's new to the case. And, unfortunately, what he's telling you people testified to is actually not accurate.

Mr. Van Valkenburg never testified that there was any duty to give notice of cancellation, written or otherwise of group long-term disability. He never said that.

What he was talking about was should there be some sort of consent or instruction from the participant in the group insurance. He never testified that my client thought there was some duty to give written notice.

The incident that Counsel is talking about with respect to Dr. Levinson actually pertains to a letter that was sent from UNUM, asking him if he wanted to continue his disability insurance after he reached the age of 65.

So there, you actually had a communication from the insurance company, that Dr. Levinson said, "Oh, I didn't know that came," and they said, "Oh, it came a couple of months ago; here it is."

So, to try and portray that as a dust-up after the fact,

where my client was giving notice months after the fact is actually just factually inaccurate.  There is no situation in this case where, months later, some notice was given.

And what we were talking about a moment ago, it's fine if we want to talk about what are the duties under the '95 contract, and what does that pertain to.  But where we started this discussion was are we going to be talking about a breach of the 2006 contract (Indicating).

And, if you look again at the '95 contract, it has rights, duties, obligations.  Whatever those are, people can try and define those.

But, you can't then bootstrap that to a contract that goes into effect nine months later, and try and claim that that now is the operative contract under which we have breached. Because, that's just not this case.

**THE COURT:**  All right.  Well, let me -- we could spend all afternoon on this.  And part of this may depend on the evidence that comes in.

But I will indicate to you right now, if I don't make a pretrial ruling, I'm going to be looking at that evidence very carefully.  And if I don't see anything to support this assertion of a continuing duty nine months after the actual cancellation -- and I am, frankly, from what I've heard, skeptical that you are going to be able to prove that -- you know, I may have to grant a directed verdict or take that

issue away from the jury.

And so, you risk putting up an argument in opening statements and having that taken away from you. That's going to be your -- I'm giving you fair warning at this point that you're going to have to prove that there is a duty of notification, that that duty of notification exists under the 2006 agreement, and that that duty was still extant, nine months after the event.

And, unless you can show a continuing course of conduct where this is the kind of thing that a reasonable jury could find that that duty existed and continued to obtain, that 2006 breach-of-contract claim will not go to the jury, and I know it's significant because it has an attorneys' fees clause in there. Let's put it on the table.

And so, I'm letting you know, in terms of whatever your discussions are before Judge -- Magistrate Judge Laporte, that I wouldn't bet the house on that particular claim.

**MR. MOLLAND:** Understood, Your Honor. I've listened to the Court; I understand the Court's predilection on this issue. Thank you.

**THE COURT:** All right. And by the same token, to the extent -- I don't know if you're still asserting that somehow ABC is not a successor entity liable for AAI's acts. I don't see any merit in that, from what I could see.

I mean, the terms of the acquisition or the merger, the

applicable law in both Oregon and California, I think make it clear.  And I don't see that as a jury issue.

I don't know if you want to --

**MR. KELLER:**  I'm not sure I see it as a jury issue, either, Your Honor.  What we were talking about for the pretrial statement were stipulations of fact.  And, we were -- I think we have stipulated to all of the facts.

And, what the issue became was a stipulation as to the effect of the law upon those facts.  And, and I just -- I don't think that's the appropriate stipulation at that point in time.  And so, that's why we did not enter into that stipulation.

The problem came exacerbated because it wasn't I was attempting to horse-trade.  I had always believed this was a case involving the breach of the '95 contract.  That's why I was seeking clarification that, well, we're not making any claim that ABC independently breached some duty.

I now learn that that -- or I learned at that time -- that that was the claim.  That they're claiming not only that AAI breached the contract in '95, but that ABC when it took over, merged, whatever that term is, in 2008, now, two years later, that ABC now had a duty -- whether we're calling it audit, do whatsoever -- ABC now had a duty to go in and give notice further at that point in time.

**THE COURT:**  Yeah.  Well, I -- you know, certainly two

-- you know, when you get out two years, or -- my level of skepticism grows even more so.

So, if what you are saying is that it is highly unlikely that A, ABC would be directly liable because it didn't come into the picture until a couple of years after the termination of the policy, I would concur on that.

On the other hand, if you're trying to say that there is no successor liability, I think that's a non-starter.  Maybe you're not even asserting that.

**MR. KELLER:**  I think the issue became when I'm asked to stipulate as to liabilities of entities, when I don't even know what the claims are against those entities, that's where I can't stipulate.

As I said, we've stipulated to all of the facts that they put forth in that motion about what is the sequence of events of corporate formation, succession, et cetera.  I don't think that's the issue.

**THE COURT:**  All right.  Well, I'll have to look at the stipulation which we will want to crystallize for the jury in terms of instructions, or at some point, figure out how we're going to get that before the jury.

But there will not be a jury instruction suggesting to the jury that they're going to have to apply the test of successor liability and determine if AAI's liable for 2006, ABC is or is not liable.  I think that's a given.  If AAI is liable, ABC

will be liable.

Whether ABC is independently liable, that gets us into the question we just talked about.  And I've already expressed my view on that.

Let me also put to bed this argument to the extent there is an argument that the duty to mitigate does not obtain until the damages become apparent.  My read of the law is that the duty to mitigate obtains upon breach, even before damages are obvious.  Especially in -- I mean, it's just common sense, in a case like this.

If, for instance, Dr. Buschman had been told in no uncertain terms that, "We've terminated your policy," and he says "Well, you know, I'll wait and see if I ever need it," the duty to mitigate does not get deferred until it becomes necessary to rely on the policy.

So, I think the issue is going to be clear to the jury, you know, that you all have set it up:  Did he, in fact, authorize this?  And there, the evidence is what it is.  We have no written documents that suggest or shows that he did authorize it.  But, you will have the testimony apparently of one witness who says, "I wouldn't have done it unless I was told to."

And he'll say, "I never told you."  And I guess the jury will have to resolve that question.

And then:  Did he know or should he be charged with the

knowledge that it had been terminated?  Apparently, based primarily on these -- what, payroll statements that show some lack of deduction for, what, is it, $300, $309 a month or something for this policy?

MR. MOLLAND:  May I be heard just very briefly on this point, Your Honor?

THE COURT:  Yeah.

MR. MOLLAND:  First of all, I agree with Your Honor, that it had -- had Dr. Buschman -- once Dr. Buschman had actual knowledge of breach, he had the duty to -- the duty to mitigate arises.  I think that's true.

The issue here is whether there is a duty to mitigate under the contract, absent actual knowledge of breach.  And I believe the law in California is clear that actual knowledge is required before the duty to mitigate attaches.  Once Dr. Buschman understood that the contract had been breached, he had a duty to mitigate.  I agree.

THE COURT:  So you are saying if there's only sort of constructive knowledge, the should-have-known standard that the duty to mitigate, there is no duty to mitigate.

MR. MOLLAND:  I think I'm saying something a little different.

THE COURT:  No?

MR. MOLLAND:  And that is:  It's a jury question as to when Dr. Buschman had actual knowledge.  If the jury

concludes, based on all the facts presented, including the payroll statements, that he did not have actual knowledge, then there was no duty to mitigate until such actual knowledge was obtained.

And our position is actual knowledge was obtained in 2012, and he did try to mitigate in 2012 once he understood the breach had occurred.

It's a jury question about whether actual knowledge occurred before that.  Defendants will say it did; that's part of the fight in front of the jury.  But until actual knowledge, there is no duty to litigate.  That would be our position.  I believe that is consistent with California law.

**THE COURT:**  And so therefore if it's only a should have known, he didn't actually know but he should have known, the jury charges him with some contributory or comparative negligence or whatever you want to call it, that there is no duty to mitigate that's triggered.

**MR. MOLLAND:**  I think that is the difference between comparative fault which is a should-have-known standard and the mitigation which is an actual knowledge, based upon all the facts.

I mean it's certainly not enough for Dr. Buschman to come in and say "Hey, I didn't know."  I mean, the jury is going to have to conclude that that is in fact true, based upon the evidence that the Defendant will put up, that he really did.

**THE COURT:** All right. Was your view -- do you share that view of the law?

**MR. KELLER:** I'm not sure we do disagree. I mean, I think what the question is, as the Court phrased it, I don't think Dr. Buschman can say "I just chose not to look, and therefore I didn't have actual knowledge."

I think there is a slight distinction between the duty to mitigate versus the comparative fault.

**THE COURT:** Uh-huh.

**MR. KELLER:** What I hear Counsel saying -- and that's why I said I'm not sure I disagree with him -- I think what he's saying is it's a question that goes to the jury to consider the totality of the circumstances about what, quote, notice was given to the Plaintiff. And then the jury decides did he have actual notice, and once he does, he has a duty to mitigate.

I think what they're just saying is he didn't have actual notice until he calls the insurance company or whomever he calls, and is advised of that in 2012. We're saying he had actual notice starting in February of 2006.

**MR. MOLLAND:** I don't think we disagree, Your Honor. I think it is a jury question as to that issue.

**MR. KELLER:** Yeah --

**THE COURT:** Where does comparative fault come in? On the tort claim.

MR. KELLER:  Yeah.  And I think it's correct, there is one in point where Counsel and I do agree again, which may be shocking, but on the comparative fault, I think the standard is slightly different.  It's knew or should have known.

And so, I think it's just a subtle distinction in the argument, but the comparative fault comes in on the negligence claim.

MR. MOLLAND:  I agree with that, too, Your Honor.

MR. KELLER:  So I think you could have the situation where a jury could conclude that, based on the -- the notices he was given, he had actual notice, he had a duty to mitigate, and he didn't, he loses entirely on his breach-of-contract claim.

You could have the opposite situation, where they find: Well, no, he didn't have actual knowledge yet so the duty to mitigate didn't start, but we find that he should have known, so under the comparative fault doctrine he only recovers X percent, which is attributed to the --

THE COURT:  Well, but these are two parallel claims.  You can lose on the negligence claim, and win on the contract claim.

MR. KELLER:  Right.

THE COURT:  And so, obviously you can't get double damages.  But even with comparative fault, if the Plaintiff

were to prevail on the contract claim, it sort of becomes superfluous, the negligence claim.  He only gets 50 percent on negligence, but he gets 100 percent or the contract claim.

MR. KELLER:  Right.  I think that's where it comes in.

THE COURT:  He could lose the contract claim -- is it possible to lose a contract claim and win the negligence claim?

MR. MOLLAND:  Of course, Your Honor.  You are articulating the alternatives here very well.  I think you could -- you could easily lose on the contract claim, win on negligence.  You could -- on the other hand, you could win on the contract claim, and the jury may not even get to negligence.

Or, they could find a big whopping comparative fault which would have, let's say, the damages, but on the contract claim would be 100 percent because there was no duty to mitigate.

THE COURT:  Yeah.

MR. KELLER:  I think you do have all those scenarios. I could envision one where he could lose on the contract claim, prevail on the negligence claim --

THE COURT:  Yeah.  And then reduce on comparative negligence.

MR. KELLER:  And have a huge comparative component.

THE COURT:  Right, right.  So the jury could find,

for instance, no duty, no breach of duty, for instance.

**MR. KELLER:**  Under the contract.

**THE COURT:**  If they read the contract, they read the contract narrowly, for instance.  Or, actual knowledge, and failure to mitigate, which would not necessarily totally wipe out on a negligence.

**MR. KELLER:**  Right.

**THE COURT:**  Well, that's helpful.  Okay, good.

So let's talk about some concrete things here.  I mean, this is all very helpful.

In terms of the time for trial, given the number of days we have set, and based on the number of hours that we have available, including jury selection and everything else, I am able to give you about eight hours each.  And I don't know if you are going the need that many because you have got about five and you have got about two witnesses, it could be shorter than that.

But I'm going to allot a maximum of eight hours.  But, that includes opening statements and closing arguments.

**MR. MOLLAND:**  Your Honor, the only thing I would say to that is that I think we have -- well, the Defendant has a videotaped deposition and one live witness.  We have three live witnesses, and three depositions.

Given the lack of testimony here on the part of -- of testimony on behalf of the Defendants, I guess I'm

uncomfortable splitting time evenly, since it's our burden.

The defense has chosen, really, not to call any live witnesses, as a manner of speaking.  Just want to make sure we have enough time to put on our case, since we have to do it.

And splitting the 16 hours evenly in this case I guess is not something that I would -- I don't want to agree with that without at least asking the Court's indulgence to reconsider that issue.

**THE COURT:**  Well, I guess my question -- first of all, I think eight hours exceeds, certainly exceeds what the Defendant needs.  So, in a way that split is a bit illusory.

The real question is whether eight hours is enough for you to present Dr. Buschman, Dr. Levinson, Mr. Van Valkenburg.

**MR. MOLLAND:**  Van Valkenburg, correct, Your Honor. And then there is a broker witness who would testify, although I think he would be very brief.

**THE COURT:**  And Ms. Kleve's by deposition?

**MR. KELLER:**  She's by deposition.

**MR. MOLLAND:**  Deposition, yes.

**THE COURT:**  And how long is her deposition?

**MR. MOLLAND:**  Well, it got longer and longer the more we haggled over the objections.  I think we would only put on 15 minutes of Ms. Kleve.

**MR. KELLER:**  The total deposition I think took an hour and a half.  So --

**THE COURT:** You can edit out objections and things.

**MR. KELLER:** Oh, yeah. I think total running time of that deposition is probably around an hour. That's -- you know.

**THE COURT:** Right. So the key -- and the broker is short, so the key will be the three main --

**MR. MOLLAND:** Yes. And I think Doctor -- realistically, I mean, Dr. Buschman's credibility and veracity is really at stake here.

**THE COURT:** Right.

**MR. MOLLAND:** And I think we have to put him on for two or three hours, and I expect he's going to go two or three hours on cross. I expect he's probably a full-day witness.

**THE COURT:** Yeah. Cross is their time.

**MR. MOLLAND:** I understand, Your Honor, yeah.

**THE COURT:** And Levinson I think is fairly discrete, right?

**MR. MOLLAND:** So, I'm not taking umbrage at the Court's allocation of time. I think we have enough time, as long as -- is I just want the -- to express a reservation, just, feeling it's my burden of proof here, I want to make sure I can put Dr. Buschman on, in particular, long enough so the that the jury can assess his credibility and veracity.

**THE COURT:** All right. Well, from everything I've heard and your list of witnesses an description, that's where

I concluded that eight hours both should be sufficient and fits within our time frame.  And I did it just -- you know, the default usually is to just split the time unless there is something extraordinary about the case, because there's cross and everything else.

But, you know, the main thing is we've only got so many hours to get this case done in the five court days that we have.  And, so, anyway, that's my starting point.  Assume eight hours, and let's -- we'll proceed from there.

There are various motions in limine and I will get out an order on all these.

But, I will say that with respect to the general issue of the first -- Defendant's first motion is having to do with parol evidence, and evidence of other contracts.  I think I indicated that in my view, there may be a question about whether there's a separate cause of action or not.  But, I do think, that given the ambiguity of the 1995 agreement, and as we know, the California law is quite favorable to the admission of parol evidence even when a contract on its face doesn't seem ambiguous.

In the *Pacific Gas* case, the Court says, well, you can introduce extrinsic evidence to show something is ambiguous, which then opens the door to extrinsic evidence on the merits of the construction.

So, given all that, given the ambiguity and the broad

terms of the 1995 agreement, I am of the view that that opens the door to a fairly wide range of extrinsic evidence.  And that includes the 1996 agreement because it may inform, for instance, intent with respect to third-party beneficiary, et cetera, et cetera.  As well as the 2006 agreement, which, there's some testimony indicating that that supposedly was somewhat confirmatory of the past practices.

And also, course of conduct is going to be relevant.  And to the extent that these other contracts have some bearing on course of conduct, post-formation, as they might inform the construction of the contract, I'm going to admit, for instance, those agreements.

**MR. MOLLAND:**  (Nods head)

**MR. KELLER:**  Just so I understand, Your Honor.

**THE COURT:**  Yeah.

**MR. KELLER:**  That's a separate issue and ruling from the one we talked about before, whether there's a cause of action under --

**THE COURT:**  Yes.  Yes.  It may be that there is no cause of action under it, but it's a piece of evidence -- just like a letter, just like conduct or anything else -- might inform what the parties intended by virtue of the 1995 agreement.

So, that is without prejudice, and -- on this question about whether there is a separate cause of action under the

2006 agreement.

Similarly, there's a fair amount of dispute about various documents that would show -- for instance, there is the 2007 spreadsheet I think we've alluded to.  Again, I think that has some probative value as to what may have occurred, people's perceptions.  So, I think it has some probative value.  And, and, I'm going to allow that, provided that there's, you know, proper foundation laid.

**MR. KELLER:**  That was the only issue I was going to raise with respect to that document, Your Honor, because Counsel argued everybody thought this document meant such and so.  There's -- it's been shown to two or three witnesses.  No one knows what it is or when it was prepared or what it means.

So, I think there has to be some foundation as to the document, as to what it means before people can speculate about it.

**THE COURT:**  What is the foundation for this document?

**MR. MOLLAND:**  It's a business record.  It was produced --

**THE COURT:**  From AAI records.  That's undisputed.  Right?

**MR. MOLLAND:**  Right.

**THE COURT:**  You know, if it came from AAI records, that already suggests there may be a sufficient foundation.  If you want to then impeach that foundation and suggest

somehow it's extraneous or got in there by accident or something, that's something else.

But, my presumption is that if it came from the records of the Defendant or predecessor Defendant, you know, there's not a question about its authenticity, et cetera, et cetera.

Now, to make it relevant, you're going to have to decipher it. And I don't know who's going to testify as to what it means. I mean, that's -- I'll have to make that judgment when we get there. So, that's true with every document that's going to be --

MR. MOLLAND: Sure.

MR. KELLER: Maybe I used the wrong word, Your Honor. I was not contending that it was not a document we produced. I think it is speculative as to what it means, and its relevance. That's the problem.

THE COURT: And who is going to testify about this document? Or interpret it, or say what it is?

MR. MOLLAND: I think it's a business record of AAI, both, I believe -- and Ms. Talarico can check me -- but I think that Mr. Van Valkenburg testified about it at his deposition.

MR. KELLER: He had no idea --

(Reporter interruption)

MR. KELLER: Oh, I apologize.

He had no idea what it was.

**THE COURT:** Well, I'll await trial. I mean, obviously, if nobody has any idea what it is and can't explain it, that may be problematic. If there's enough there, from which a jury can infer, you know, what it is, or at least without sheer speculation, then it is likely to come in.

But --

**MR. MOLLAND:** You know, here's what I think we'll be able to prove, is that AAI had a custom and practice of preparing spreadsheets like this. That when they prepared spreadsheets like this for insurance policies, they try to put the roster of everybody who was signed up for them on the spreadsheets.

They did this on a routine basis. There were spreadsheets in other years. This is a spreadsheet for 2007. I mean, I think that's going to be the foundation.

We probably can't do much better than that because the people at AAI say, you know, "We don't know why he was not on here."

**THE COURT:** All right. Well, that provides some insight as to what it is, and what it likely may be. That may be enough, if you are able to elicit that.

**MR. MOLLAND:** The witness, Mr. Van Valkenburg --

(Off-the-Record discussion between counsel)

**MR. MOLLAND:** Mary Kleve testified as to this document (As read):

"It would be for our records so we know who is on the policy and who's not."

THE COURT:  All right.

MR. KELLER:  Yes.  Well, we don't need to belabor the point.  We can see when it comes in, that was testimony about the document in general, not that specific document.  But --

THE COURT:  Let me say other examples of things that shed -- that have some relevances as to what the parties' practices were, such as, you know, conveying communications from UNUM to Dr. Levinson, et cetera, I think are all, at least to me, facially relevant.

And so long as, you know, there's not a hearsay problem or foundational problem, you know, my view of relevance is fairly tolerant in this matter, because of the nature of this transaction.  I think a lot of course-of-conduct stuff is likely to have relevance here.

There are some other issues.  There's this -- these NCAP March financial review notes.  I guess the question I have, these appear to be corrections for previous, what, accounting type errors?  This is Exhibits 42 and 43?

MR. MOLLAND:  Correct, Your Honor.  These are just correction of documents to show that they made some errors.

MR. KELLER:  Well, and this goes to this issue, Your Honor, which is the subject of one of -- our motion, which is they are clearly attempting to use other conduct, bad

acts or otherwise, to try and prove what happened with respect to Dr. Buschman's cancellation.

And I think the law is pretty clear that if that's the basis for which you are trying to use it, which is what they are, which Counsel just said, "Here is some other incidents where they made mistakes," one, I think that's inadmissible under the Evidence Code.

And I think it's -- it's -- whether it is under 403 or otherwise it is pretrial be an improper argument to say, "Well, you know, two months later they did may a mistake and they spelled somebody's name wrong so therefore they're a careless company, so therefore you can conclude and find that in February or January of 2006 they acted carelessly."

**THE COURT:**  Well, this also applies to Exhibits 57, 58, the internal AAI memoranda identifying some errors in 2006.  The question in my mind -- there's a couple of questions.

One, it raises kind of a theoretical question whether 404(b) was intended to apply to sort of not character of individuals, but corporate policies and acts.  And although there are -- there are some cases that apply it to corporate conduct without analysis, I have some serious questions about that.  Because the whole point is, you know, you are not supposed to impugn character from what somebody else did, you know, a year before or two years before.

On the other hand, if a procedure that a corporation follows is rife with error, or if their manufacturing process has lots of problems, I don't think it is a 404(b) problem. But that's not to say there may be a 403 problem.

And in the end, I'm not sure how much difference it makes, because what I'm going to say is that if you are going to try to introduce evidence of errors, they have to be sufficiently tied so that is a fair inference and the probative value outweighs the prejudicial value.

So, if it's a name misspelling or something, or if it occurred at some point in time that is not proximate or related, or -- you know, by somebody else.  Let's say they had a terrible bookkeeper in 2001 or 2003 or something, that was no longer there.  Well, you know, I don't think that is very relevant.

On the other hand, if there's evidence that there is a very similar kind of mistake, it's made by the same people or the same process led to it, that there is some tie that it really actually has some probative value, then I think, you know, the probative value may exceed the prejudicial value.

In other words, I see it is a 403 analysis rather than a -- and 404(b) incorporates 403 type analysis in any event, although the burden is different.  But, that's what I'm going to be looking at.

So I will indicate to you that if you want to introduce

that kind of evidence, there's going to have to be some foundation laid.  Not just any error will do.  It's got to be something that sheds some light.

It's similar to police practices cases where somebody's been -- had complaints against them, and it's for a search problem, not excessive-force problem.  Well, that's not coming in because it's a different --

**MR. MOLLAND:**  Understood, Your Honor.  And we agree with that.  Just 30 seconds on this.

We're not going to be introducing this evidence in our case in chief, anyway.  This is if -- it would only be introduced if the Defendant says, "Look, our business practices were such that we never would have done this, had we not gotten permission from him in some fashion.  Our standard business practices do X, Y and Z, and we followed that in this case."

In that case, then we put some evidence on of errors that are connected to this same type of process in the same kind of time, done by the same type of people to show, "Sure, you know, you probably try to avoid mistakes but, hey, you make them, and here is some proof of it that you produced from your own business records."

I mean, that is all this goes to.

**MR. KELLER:**  That's the slippery slope, which is:  There are some kind of errors made by some kind of people that

are sort of related to this that are somewhat similar.

The supposed error I guess here is we didn't get written instruction from Dr. Buschman.  I guess that's the supposed error.  First of all, there's no duty for that, but that's another point.

But, so, all these that I looked at, none of them related to that.  It was, "Oh, you miscalculated this, or you didn't do that, or you didn't do this."

I mean, I just want to make sure that they are going to be held to this standard of it is really a directly relevant error or mistake, not just accumulation of, "Well, you made a bunch of mistakes, and therefore, Mary Kleve on this particular day was a careless person."

**THE COURT:**  So in other words, a miscalculation of some dollar amount is different in kind than ordering some policy or canceling some policy, or doing something she wasn't authorized to do, or, you know, something that -- I don't know if you would use the word "ministerial," but it does seem to me that there are different kind of errors.

And, accounting errors in terms of adding up numbers wrong seems to me is a different kind of conduct than canceling somebody's policy when it shouldn't have been canceled.

**MR. MOLLAND:**  Seems to me, too, Your Honor.  I agree.

**THE COURT:**  This is going could to come in on cross, perhaps, and we'll have to see.  May depend on how broad your

direct testimony is elicited.

If you -- if you get testimony that "We never make mistakes, period," then, the wider you open that door the wider the cross may be. So I'll have to make that judgment when we get there. But it is a 403 type analysis, it seems to me.

Let's see. There's a motion to exclude lay opinion testimony on the standard of care. And, in that regard, you know, here, this is not -- where there -- an opinion can be given where it is something is within sort of the common knowledge of a lay individual, that doesn't require the expertise of specialized knowledge of an expert.

And here it seems, depending on what the testimony is, if it's something like, "Well, you shouldn't cancel without somebody's consent," I don't think you need an expert on that. Of course, I'm not sure what a lay opinion would add to that. That seems pretty obvious to me. But --

MR. MOLLAND: Your Honor, I'm not sure we're going to put any opinion testimony on, on that subject. I mean, it speaks for itself, and the jury can form their own conclusion.

MR. KELLER: This comes back to the issue that we have talked about this afternoon, Your Honor, which is: What is the duty we supposedly breached under the negligence theory? That's the problem I have with it. It's one thing when the case was, well, you couldn't have canceled the

insurance without consent.  Okay.  I mean, maybe that is something that the anyone can understand.

Now it's become a duty that's morphed into this duty to give direct notice (Indicating quotation marks).  This duty to give actual notice (Indicating quotation marks).  And it's a duty supposedly imposed on a practice manager.  Not on the insurance company, not on a broker.

Those are not duties that are within the common knowledge of a juror.  There's not --

**THE COURT:**  Well, right.  So, if they try to introduce through a layperson evidence of industry practices and what the normal -- what the insurance manual suggests or what the training is in the field, or what is a common practice in the field of insurance management or business management for an entity like this, yeah, that looks like expert testimony.

**MR. KELLER:**  Because, the problem we face with no disclosure of an expert on this issue -- I mean, had I known they were going to try and create these duties or a standard of care that I know does not exist, I mean, I certainly would have either, A, deposed that person or B, hired my own expert.

So, I think where you're going through these supposed specialized duties of practice managers, I think that's where the problem starts to become --

**THE COURT:**  I don't know if you intend to introduce

anything like that.

**MR. MOLLAND:**  To me this is such a simple case.  If Dr. Buschman didn't consent to the cancellation, they both breached the contract and they breached the standard of care, because reasonable people entrusted with maintaining insurance policies and paying premiums don't cancel them.  Okay?

And then, secondly, if that's true, should they have told Dr. Buschman about this directly?  I don't think there's any magic about that.  I mean, I think, is that what -- would a reasonable person would have told Dr. Buschman about that?

Defense basically says, "We did tell him."  I mean, their whole defense in this case is, "We told him 77 times.  When we were AAI and we were ABC we kept telling him and telling him, and he wouldn't listen."

Okay.  That's what their defense is.  We're just saying, that's not enough.  The jury will decide.

**MR. KELLER:**  There's the problem.  The first statement is, "Well, you know, this is a simple case.  It's just if they cancel it without consent, that should never happen.  And, you have this the duty to give" -- and it's this phrase -- "direct notice and actual notice."

And, that's the one I've constantly taken exception to. Because that is creating a duty where we have to send something to the insured and say, "This will advise you that your policy has been canceled."  And, that's the insurance

context.

And that's where I think they're trying to take this case, is to make it an insurance bad-faith case or a broker case, when it is not.  There's absolutely no duty that I'm aware of that anyone would establish that a practice manager who are processing insurance premiums have to send a direct notice to the insured.  It doesn't exist.

And that's the one -- they have no one who can say that exists.  And if that's what they are trying to argue is the standard of care which we breached, they can't prove that standard of care.

**THE COURT:**  How will you prove this duty of direct notice, or notice?

**MR. MOLLAND:**  A reasonable person, if they were going to cancel somebody's insurance, would tell the person about it.  I think that's the clearest negligence standard:  What would a reasonable person have done in this situation?

As I've said, the Defendants are essentially saying they gave notice.  Their entire case is based on the fact they gave these 77 notices.  So, they're not saying they didn't have any duty to do that.  They're saying they did have a duty to do that.  They did discharge that duty.

And, our position on this:  That a reasonable person who cancels insurance and basically deprives a person of disability benefits when they have become totally crippled and

their profession is cut off at least should tell the person about it, if that's entrusted to their care.

We will present testimony that in fact the insurance -- AAI, the Defendant in this case, had all the direct contact with the insurance company, with UNUM.  They got the notices from UNUM; they paid UNUM.  Dr. Buschman didn't contact and didn't communicate with UNUM at all.  It was the insurance -- it was the Defendant who did that.

And, having had that -- having been entrusted with that, with that duty, a reasonable person would tell a doctor that they canceled his insurance, if they did it without his consent.

I don't think there's -- there's no expert testimony that would be necessary to establish such duty.  Your Honor would establish it through the -- through the instruction under CACI, of standard of care.

**MR. KELLER:**  Well, the problem here is:  This is a practice manager.  And what -- we look at the contract and what they are obligating themself to do is process the insurance premiums.  There is nothing in the contract (Indicating) that defines a duty or a standard of care to give actual and direct notice.  And this is where I keep focusing on this phrase.

So, if it's not in the contract then it has to be in the negligence claim.  Therefore, you have to establish that there

is a standard of care for practice managers when they cancel somebody who is a participant in a group policy, to give notice, by that he keeps saying actual --

THE COURT:  I guess that is the issue.  In order to survive, for instance, the directed verdict, you have to have evidence of standard of care in the industry, or can you leave it to the reasonable-person standard?  Let the jury decide what is reasonable under the circumstances in terms of imposing or finding some duty and breach of duty.

MR. KELLER:  And what's really curious is Dr. Buschman had two previous long-term disability policies that he got through his insurance broker.  And when he canceled those, his broker didn't send him written notice.  A broker who actually has a relationship and has a duty to give notice, didn't give any notice.  So, I fail to see how you can then impart this specific duty of giving actual notice to a company providing --

THE COURT:  Why don't, as I'm sure you will, introduce that to the jury, knowing that the Plaintiff is not going to have an expert to come back and say, "Well, the industry practice actually is XYZ, et cetera, et cetera," and see either what the jury does or whether you're entitled to a directed verdict at that point.

MR. KELLER:  Well, it may be there's an issue of directed verdict, because I agree.  I think for a negligence

claim, for a professional, I think you have to establish the standard of care by an expert.

I don't think it is something within the common knowledge of a juror to say, "Well, if you had group insurance, wouldn't you expect to receive written notice?"  That's irrelevant.  It is really what this type of practice management, what they do.  And, they don't have that type of testimony.

**THE COURT:**  All right.  Well, perhaps in your motion for a directed verdict you will have authorities on that point, about the insufficiency of the evidence and the need to have standard-of-care evidence particular to an industry where you have -- asserting professional negligence.

But, I'm not going to rule on that now since that's not been --

**MR. MOLLAND:**  This is not a professional negligence case, is our point.

**THE COURT:**  All right.  Well, all right.

Let me talk to you about the objections to the exhibits.  Again, generally, emails that go, for instance, to and from Mr. Buschman or Dr. Buschman, to the extent they relate to his state of mind, his knowledge or not that he had canceled things, I think in the first instance is relevant, and relevant for a non-hearsay purpose.

Similarly, those things that go to the understanding and state of mind of the -- of AAI is relevant.  But one of the

problems that seems to occur here is that there are documents that are sort of chain emails that, as you go further back in the chain, they're attaching emails between third parties, not directly.

I know it ultimately gets to Dr. Buschman, but they go back, and therefore they sort of contain hearsay within hearsay. And as you go back further, it's almost triple hearsay.

And, they begin not to shed much light on his state of mind. I mean it's already indicated sort of his surprise, for instance, about, you know, being canceled, and "What can I do," and this sort of thing, to get back into, well, what UNUM, UNUM told AAI, what AAI told the broker, and the back-and-forth.

Not only is that double and triple hearsay; I don't see how it really informs his state of mind which may be informed by the first part of that chain.

So, my inclination is to say, well, a fair amount of these things, like Exhibit No. 109, may -- part of it may come in on, for instance, state of mind.

For instance, when he says, first line (As read), "Did I terminate the group policy in writing? I do not remember doing that, and I assume that it was still in the group policy," and that's in response to "Here's what the insurance broker said, you were terminated from the group plan as of

February 1, 2006," seems to me that that -- that would come in.

But if you go to the second page and it talks about, "Well, I called Paul Revere and they said this and this and that," that becomes more problematic both in terms of multiple hearsay, and the probative value begins to diminish.

And so, one approach is to say, "Well, all right, first page comes in but the second page doesn't." Even though it's not complete, I'm not sure how else to cut this.

Because, there's a fair number of these things where it looks -- the first part of it, yeah, I could see where goes to somebody's state of mind. But as you get deeper and deeper, it's like, "Well, somebody told me that somebody told me this is what happened." And so, you do have multiple hearsay issues there.

**MR. MOLLAND:** Your Honor, I agree with the -- the basic thrust of your analysis as to these emails. Some of them, of course, we objected to; some of them the defense objected to.

**THE COURT:** Right.

**MR. MOLLAND:** And both on the same grounds. I think they come in as notice to Dr. Buschman; they come in to his state of mind.

To the extent there are emails which have colloquy between third parties, in general, I would think that that portion

would not come in unless there's some exceptional reason for that.  I think that that is kind of our position on that.

But, essentially, the -- these emails that I'll call "The 2012 Buschman emails," they come in to show both his state of mind, the notice he got, whether he was a liar when he says that he didn't know that his policy was canceled in 2012 until he -- he received this information (Indicating).  That's the general thrust of it.

I think they also come in to the extent that AAI or ABC's people are telling Dr. Buschman something.  They are admissions.  And they come in for that reason.

To the extent there was third-party colloquy, I think we have to -- I agree we should look hard and we should approach the court and before this evidence is admitted and explain what the basis for admission would be.  I think I basically agree with that approach in these documents.

**THE COURT:**  The one area where it gets complicated is let's say somebody at AAI or ABC talked to somebody at -- ABEO, or however you pronounce that --

(Reporter interruption)

**THE COURT:**  A-B-E-O.  Yeah.  You can see that goes-- you can say that goes to the state of mind of AAI.  The problem is it's double hearsay at that point.

If they had said it to Buschman, and he testified, that's one thing.  Or, if the ABEO witness comes and testifies, and

says, "This is what so-and-so at AAI told me," then it's single hearsay, but it may be non-hearsay because it goes to -- that's the problem where you get --

MR. MOLLAND:   I agree generally with that concept, Your Honor.  And I can maybe save the Court's time by saying I think we are on the same page here.  We don't want them for that purpose, anyway.  I mean, generally, if they're an admission to Dr. Buschman, they should come in; if they go to Dr. Buschman's state of mind, they should come in.

If it's back-and-forth between an insurance broker and AAI, we probably would forego it.  They are not critical to our case.

MR. ROSENGREN:   Again, in general, Your Honor, I'd agree with that.  I think that our concern is largely the speculation that is happening between third parties regarding why something happened or why his policy was canceled.

And, I think to the extent we can avoid showing that to the jury via redactions of materials that are not relevant, that's a pretty easy solution both sides can employ.

(Reporter interruption)

MR. ROSENGREN:   Both sides can employ.

THE COURT:   Right.  What I'll do is indicate where I think the line should be drawn.  And in response you have -- I call these "bellwether objections."  You have a sense how to treat the other.

Another example of that, there's kind of this opinion by Mr. Lucas in Exhibit 133, it looks like Dr. Buschman should have or would have taken these deductions -- would have seen these deductions.  That's -- that witness, I don't think testifies -- it's really kind of opinion testimony that -- again, it's both hearsay, it's lay-witness testimony not based on, I think, information directly available to that person.  And, it's not been proven that person is qualified to give an opinion.  So things like that also fall into the exclusion territory.

Now, had it -- again, had that one gone to Mr. Buschman and somehow it's shown to be relevant to his state of mind in a way that adds something, that would be.  But that one is not -- that's not the case there.

There are a bunch of exhibits that I want to talk about.  These business expense vouchers.  I guess this is to show sort of the -- how careful Dr. Buschman was down to the last penny in terms of looking at dollars and cents?

**MR. MOLLAND:**  (Inaudible)

**MR. ROSENGREN:**  Your Honor, generally, I think those go to rebut the claim that he deferred everything to AAI and ABC in terms of his management of his finances.  And that's totally not true.

**THE COURT:**  And I think that is fair because it -- you know, to the extent he testifies that he deferred, he

didn't look at this stuff that carefully, I understand there may be a response to that, he's going to explain.

But, you know, I think once you put sort of his state of mind at issue -- and it is at issue in this case -- that comes in.

MR. MOLLAND:  Understood.  I think one of the -- maybe we can work it out.  I mean, the other prejudicial part about this is that there is a -- some of them show his expenses and credit card information, and a bunch of other purchases he's made.

And the one thing we don't want -- at least I would like to avoid is to have evidence going to the jury that essentially would be taken for the proposition that he's a rich guy and he's not going to miss $790,000.

MR. ROSENGREN:  Understood, Your Honor.  We can certainly redact any personally-identifiable information.  And if there are purchases that seem suspect, we are willing to meet and confer on that.

THE COURT:  All right.  Let me ask you.  Exhibits 20 through 29 are emails between Mr. Buschman or Dr. Buschman and ABEO.  During the period of discovery, he didn't have insurance.

And, I guess it's the same kind of thing, that a lot of it is relevant, but as you dig further and further back, I guess that's the kind of thing that I'm concerned about.

**MR. ROSENGREN:**  Exactly, Your Honor.  That falls, I think, directly under the same category that we've already talked about.

**THE COURT:**  Well, let me ask about these handwritten -- there's these handwritten notes, 55, Exhibit 55, which I take it those are his notes, from --

**MR. MOLLAND:**  His notes, based upon a conference he had with somebody who's apparently going to testify here.  So, the sole live witness for Defendant, Bonnie Starr, he took notes about what she said.

I tend to agree with the objection to the extent that they are hearsay, but they are past recollection recorded, and they can be read to the jury.  Whether the jury gets to take them into the jury room as admitted evidence is another matter we can discuss later.  But, they certainly are past recollection recorded, and they constitute admissions of the Defendant about what happened at -- on that date.

**THE COURT:**  So this is notes from one -- from a call to Ms. Starr.

**MR. MOLLAND:**  Correct.  I believe that is true, yes.

**THE COURT:**  Not to other people, because the second page, there is a reference to "Debbie."  And I couldn't tell whether that was a call made to Debbie Tolle, or --

**MR. MOLLAND:**  I think Debbie Tolle is the bookkeeper for ABEO.  Right?  And I don't think Debbie Tolle worked for

ABC.

So to the extent that there are -- I mean, if there's knowledge or state-of-mind issues which are relevant, I think they would come in.  But they certainly don't come in as admissions, because what Ms. Tolle told Dr. Buschman would not constitute admissions.

THE COURT:  Right.  So.  That's what I'm trying to figure out, whether these are notes of two different calls, or if --

MS. TALARICO:  They are, Your Honor.

THE COURT:  So when Debbie's name appears, that's when he's taking notes of Debbie calls.

MR. ROSENGREN:  (Inaudible)

(Reporter interruption)

MR. ROSENGREN:  I apologize.

That is the portion that we take issue with, that second -- I think it's the second half of the second page, perhaps.

THE COURT:  Because it's not a party admission at that point.  And so, it is only admissible to the same extent he could testify as to what she has told him.  And I'm not sure how else it would -- how it would come in.

MR. MOLLAND:  Well, it would come in, I think, to say, "Do you remember what Debbie told you?"

And he would say, "Well, kinda."

"Well, is there something that can refresh your recollection?  Did you record your conversation?"

"Yes, there is."

"Here's Exhibit blankety-blank.  Were you aware of what -- did you take these notes at the time?"

"Yes."

"Did she say these things to you?"

"Yes."

"Does that refresh your recollection?"

"Yes, it does."

(Reporter interruption)

**MS. TALARICO:**  So, past recollection recorded.

**THE COURT:**  So, his testimony about what Debbie told him is relevant because it goes to his state of mind?

**MR. MOLLAND:**  Right, Your Honor.  It's not an admission, as opposed to the other preceding notes, which would be admissions of the Defendant.  And, also past recollection recorded.

**THE COURT:**  Well, I will say this.  If requested, I will give a limiting instruction at that point, that what he says that Debbie told him goes to his state of mind, not to the truth of what she is saying, because he may be then recollecting, "Well, I talked to UNUM, and they told me this and that."

So, you know, to the extent that there's double hearsay in

there, I think it would be appropriate to give the jury a limiting instruction.  But I won't give that *sua sponte*, because I often forget.  So I'm going to, you know, indicate to you that you should ask for it, and I'll give it.

MR. ROSENGREN:  We'll be on the lookout, Your Honor.

THE COURT:  All right.

On the jury instructions, I don't have preliminary rulings yet.  And I was going to ask you all whether, in light after what we have just talked about today, in my view, the sort of the scope of the case, whether you can try to resolve -- there are a few instructions where you have some differences where one is proposing and the other is not agreeing to it, whether you can take a crack at at least the ones that are at issue to see if you can narrow your differences or eliminate the differences, before I take a final crack in issuing proposed instructions.

MR. KELLER:  There was one issue that I think is a global philosophical issue that need to be addressed and I thought it was going to come up in connection with some of the documents.

If we look at the complaint that was filed in this case, it has two causes of action: breach of contract, and for negligence.  But under each of those causes of action, the only damages prayed for are (As read):

"Plaintiff is not receiving benefits under the UNUM

GLTDP, and is precluded from receiving those benefits.  Plaintiff thus suffered monetary damage in an amount subject to proof at trial."

That's the way this case has been pled.  That's the only claim that was made, that either because of the breach of contract or because of the negligence, he was deprived of the policy benefits.

**THE COURT:**  Uh-huh.

**MR. KELLER:**  So be it.  Now they are making a claim or attempting to make a claim for non-economic damages, including emotional distress.  And, they have asked for instructions on emotional distress.

The basis for their non-economic damages appear to be things like:  "We contacted ABC and they didn't settle the case, they didn't pay him the policy benefits."

Counsel made reference to, "Well, they didn't produce documents as quickly in this case as they should have.  And, other litigation-related conduct."

Well, first of all, they haven't pled emotional distress.  And I think at this late stage, I don't think they should be entitled to pursue damages that they've never identified in this case.

Second, where this -- this type of case where it is an economic-loss case, the law is pretty clear:  You don't get emotional distress.

And third, if you -- the basis for your emotional distress and/or your economic damages, first you have to show some injury related to it.  I've seen nor heard nothing.  And they certainly have no one who has testified about some physical injury that he suffered as a result of the breach of contract.

And to attempt to bootstrap in litigation-related conduct, settlement, or failure to settle, and/or raising a demand for indemnification, all of which would be privileged if asserted, the final issue here is that under the merger agreement, there is a right of indemnification for certain claims that AAI would be entitled to from NCAP and its doctors.

ABC's lawyer -- not us, but ABC's lawyer -- made a demand for indemnification under the merger agreement.  That demand was made to NCAP, and I guess made to certain other doctors, including Dr. Buschman.

Dr. Buschman apparently wants to testify in this case that when he received the demand, it exacerbated his emotional state.  Well, if that case was pled, we would have an anti-SLAPP motion under the California law.

So, I think whether it's in the guise of jury instructions that have been requested and/or evidence going to this supposed non-economic damage issue, I think we have to address that issue.  Because those -- those items of evidence, those exhibits are clearly inadmissible under any theory that's been pled in this case for the damages, which are the policy

benefits.

And, if you are trying to seek them under non-economic damages, I have all kinds of objections to them.

THE COURT: All right. What about that?

MR. MOLLAND: Well, the -- let's take the first demand for indemnity. It's not simply that the demand for indemnity was issued. The demand for indemnity was issued, and them coupled later on with a claim made in the opposition to our motion in limine that it was our burden to prove that ABC was the successor and should be liable for AAI.

They took a completely different position in the motion -- in their opposition to the motion that they did -- that they took in their demand to Dr. Buschman, to be that Dr. Buschman indemnify and pay ABC if, in fact, this claim was meritorious.

To me, that's simply a bad-faith letter that became -- that was illumined and shown to be bad faith during the conduct of this litigation.

The contract under which the Defendant says -- the 1995 contract -- should be interpreted such that the plain language and only the plain language should apply was not produced in discovery. No one testified about it. The claim is that it was in a client file, and hadn't been produced because of that. And, wasn't produced until four or five months or so after discovery had closed.

Those are the kinds of -- irrespective of the failure of

any settlement offers until we filed our pretrial statement in this case, those are the kinds of things that have, to put it mildly, upset Dr. Buschman.  They've caused him to alter his life, caused him to change his life.

Under the negligence theory, outrageous conduct, conduct which is --

**THE COURT:**  But, none of that is pled.  The damages are quite clearly pled here, is the benefits under the UNUM policy.  This was never amended.  You've got also privilege issues.  When things happen in litigation that you don't like, you may have sanctions here in this Court under Rule 11, under some other rule, inherent power -- authority of the court. Or, if you had attorneys' fees and could drive up attorneys' fees.

I don't see, for multiple reasons, how you can claim anything other than what's pled in the complaint that has never been amended.

**MR. MOLLAND:**  Well, all these actions occurred long after the complaint was filed.

**THE COURT:**  Well, that's why we have amended complaints.  You move for leave to amend, and we could have litigated the issue.  To the extent now you're seeking non-economic damages for emotional distress, you want to add a claim, and we go through the whole Rule 15 analysis.

But, that hasn't been done.  That's why we have

complaints. Complaints frame the issues. And, the complaint here is quite clear that what the results -- the proximate result of the breach of contract and the negligence is that Plaintiff's not receiving the benefits under the UNUM GLTDP policy.

So, I do have a problem with now expanding this case to include not only a range of damages, but a range of damages going those letters. Not only a range of damages, but a range of damages that go into conduct that occurred. I mean, are we going to have the jury hear why they decided as a litigation matter to do this, or why these documents weren't produced in time, and whether that was bad faith...there's a reason why there's a privilege attached to a lot of this stuff, to litigation-driven matters. So, I don't see it.

I've always thought this case was about the breach and the denial of coverage, which in this policy sounds like a substantial six-figure number. But until I saw the instruction which, frankly, was sort of just sitting in there, I didn't see it highlighted -- but now I do see it highlighted. Non-economic damages is -- is new.

**MR. MOLLAND:** It is not in the complaint.

But we would request the Court, after considering the evidence we would put on of conduct which has caused these damages, to allow us to amend the complaint to conform to proof.

**THE COURT:**  Well, that allows you -- that means that we're going to have to go through trial, and now are we going to take testimony from the attorneys and from the people who wrote the indemnification letter, and what was behind that, what their thinking was behind it?

I mean, that's a whole new trial.  That's no longer about, you know, who gave what notice, and was there authorization to terminate, and did he know or should have known, et cetera, et cetera, about the termination of the disability policy.  It turns a fairly straightforward case into sort of mini trials on a bunch of other things involving wholly different actors at this point.

**MR. MOLLAND:**  And that is how the Defendant has aggravated Dr. Buschman's damages, and we would seek leave to show how that aggravation of damages has occurred.

And, as to this request for indemnity, I don't believe that's -- if there's a good-faith basis for it, I would sure like to hear it from the person who wrote that letter.

**MR. KELLER:**  Well, Your Honor, this case has been pending for I don't know how long.  A couple of years.

One of the bases for the supposed outrageous conduct is not what occurred in the litigation.  They say that, "We tried to approach ABC before we even filed the case, and they wouldn't pay us.  They wouldn't settle with us."

I'm unaware of any authority in a general negligence claim

-- we haven't even addressed the hurdle of how do you get non-economic damages, emotional distress in a negligence claim. That's the first program problem that I don't think they can get over.

But now, when we're talking about -- the evidence I want to put in are: Settlement discussions. "You didn't settle in good faith with me. And that somehow supports my emotional distress claim in a breach of contract and/or a general negligence claim."

I mean, if that is really going to be the claim then I would say then let's continue the trial, let's have a motion to amend, and let me brief that issue.

Similarly, where my client wants to assert their legal rights of indemnification, and you want to say that supports hundreds of thousands of dollars of damages, let me file my SLAPP motion on that.

You want to say, "It's bad faith. You engaged in bad faith." This is where I told the ask the Court earlier they are trying to take this case. "This is a bad-faith case." This is not an insurance bad-faith case. There's no bad-faith settlement posture that supports emotional distress in a negligence case.

Finally, they say, "You didn't produce documents on time." Well, we can debate when they were produced and why they were produced. But the appropriate motion at that time would have

been to this Court that they've done something wrong in discovery, and "Here's my monetary sanction against the lawyers," or "Here's what should happen in the course of conduct in the case."  Not that "The Plaintiff gets $400,000 that I want in emotional distress damages"?

**THE COURT:**  All right.  I'm not going to allow -- I'll just indicate this now:  I'm not going to give the jury instructions on -- that would suggest to them they can award non-economic damages.  It's not something that was prayed for. There was never been any amendment to the complaint.  There's been no indication until now.  I assume there was not a Rule 16 disclosure, which would have been required.

And, there are serious legal problems, wholly apart from the failure to amend and give fair notice, among those which have been articulated by Mr. Keller, which includes the litigation privilege, serious 403 problems in terms of now bringing in -- I don't know if you're going to put the lawyers on to testify and a whole cast of other characters about conduct that occurred just before litigation, during litigation, in conjunction with litigation.

And so, we're not going to try how this case is litigated. There are other potential fora for that.  But, not in this case.  This case is about what happened in 2006, and the consequence of being the potential denial of coverage that Dr. Buschman allegedly suffered as a result of either tort or

breach-of-contract theory.  That's what was presented in the complaint, that's what's been litigated here, that's what we're going to try this case on.

So I'll indicate to you that now, and you'll see that when I -- well, I still want you to meet and confer about the other instructions.  But I am going to tell you now, I'm not going to give an instruction that will allow for non-economic damages in this case.

So, with that, I think I need to get out -- there is some other specific things -- I do have a question for you.  And that is:  There's an email, I think it's 19, an email exchange between AAI about how -- and Hoover, of Hoover Insurance, about what it takes to cancel insurance.

And I guess the theory that the Plaintiff advocates is that this shows -- this is indication of the kind of practices in the industry, about what it takes and what the obligations are of somebody in AAI's position.

The issue -- and I can understand that.  Of course, this occurs almost -- almost three -- well, I guess two and a half years, about two years before the actual cancellation.

And so, I don't know; is this relevant?  Something that that --

**MR. MOLLAND:**  Yes, Your Honor.  Can I -- would you like me to explain?

**THE COURT:**  Yeah.  I'd like to hear what your

explanation is.

MR. MOLLAND:  This exchange of emails, first of all, it pertains directly to Dr. Buschman.  Dr. Buschman calls AAI with a question about the group disability plan.

2003 is approximately the time when this was offered to Dr. Buschman and other NCAP physicians.  So, this is the origin.  This is the beginning of the group disability plan that was handled by AAI.

THE COURT:  This is when it started?

MR. MOLLAND:  This is when it started.  Right.

MS. TALARICO:  Yes.

MR. MOLLAND:  So, this is -- this is the birth of the baby.  At that time, Dr. Buschman calls, and says, "Tell me more about this.  In particular, I would like to know what happens if I want to drop it.  Is this something that lasts forever?  Is it something I can get out of?  Is it something -- what are the terms of this?"

AAI writes to an insurance broker, because they don't know how to answer Dr. Buschman's question.  And this is a -- to induce him or not to induce him to enter into this -- enter the policy.

And their insurance broker, this insurance broker who's handling other insurances for them -- although not apparently this one at the time, but AAI handled many insurances for Dr. Buschman.  Medical malpractice, health insurance, you name

it.  Every insurance he had, AAI handled it for him.

So, this is a new one.  Dr. Buschman says, "Tell me more about it."

They talked to a broker, somebody who is, I suppose, an expert, as Mr. Keller said, in the brokerage, and says, "Can you answer the question that Dr. Buschman poses for us?"

And so they answer it for AAI.  And, it's relevant because it tells AAI what the -- an insurance broker who was doing other work for AAI would tell them, would tell Dr. Buschman.

Now, we don't know what AAI told Dr. Buschman.  But, it is notice to AAI of what their broker says about the subject.  So, it's relevant.  It's information they -- that AAI, the Defendant, requested in response to Dr. Buschman's request.

And it gives -- I'm not -- we're not offering it as to whether or not -- for the truth of the matter that this was their policy.  We're just saying this is information they got from an insurance broker, in response to Dr. Buschman's question.

**THE COURT:**  Okay.

**MR. ROSENGREN:**  Your Honor, I think that the principle problem with this is that there's simply not enough of a nexus between what AAI could be deemed responsible for doing in light of request to cancel and what Hoover Insurance's own internal policies are with respect to cancellation.

There's no suggestion, and I don't believe there will be a witness to testify that this was somehow incorporated into AAI's practices.  It certainly, I don't believe, was communicated to Dr. Buschman.  If it was, he can obviously, I suppose, testify as to what he was told.  Likewise, he can testify as to what he understood during the initiation of the group disability policy.

But what Hoover Insurance did in 2003 and the policies they followed, I don't see --

**THE COURT:**  What is the relation between Hoover Insurance -- were they the broker at this time for the policy?

**MR. MOLLAND:**  Yes, Your Honor.  They were the original broker of the group policy that was handled by AAI.

**THE COURT:**  All right.  So at the very least, it's suggested that AAI knew some 26 months before that if one of the participants wanted to opt out, there would have to be an official letter from the employee requesting --

**MR. MOLLAND:**  Yes, Your Honor.

**THE COURT:**  -- and a date.  And to the extent that they were so informed -- AAI, that is -- you know, it seems to me that goes to -- has some value, some probative value as to figuring how the what their practices was, what they may have known at the time, what may have actually happened at the time, whether they got a letter or not.

**MR. ROSENGREN:**  Your Honor, I think the problem is

that there's no indication whose requirement it is that there be a written policy.  Appears to be Hoover's.  It's not UNUM's.

If it's UNUM's, they can put on the UNUM policy, and show where the requirements are for a cancellation of --

**THE COURT:**  But they're the broker.  And they are responding to an inquiry from AAI.  So, unless AAI's going to disregard, say, "Well, You're just a broker, I don't care what you say, I only care what UNUM says," the fact that they wrote -- made the inquiry of Hoover and Hoover responded suggests, you know, what Hoover says to be accorded some weight.

And, you know, you can try to argue that, well, you know, this was only the broker, wasn't -- and we have no knowledge whether this became practice or not, et cetera, et cetera.  But I can't -- I can't conclude this has no probative value.  So --

**MR. ROSENGREN:**  And, Your Honor, I guess that's our other issue, is we believe that the prejudicial effect would outweigh whatever probative value there is to this.

I don't know that a jury could be expected to discern that, oh, this is not being offered for the truth that written cancellation is being required; it's simply being offered as yet another tool in the toolbox or piece of knowledge that AAI had at its disposal.

**THE COURT:**  All right.  Well, I think it's -- meets the test of admissibility, given it involves the same individual, Mr. Buschman, in this case.  It is about 26 months away from the event in question.  It's some distance.  But, it's -- but it involves the same policy.

And so, I think there's enough of a tie here that gives it enough relevance that it would not be excluded on relevancy ground.  So.

Anyway, I will get out an order that lays these out, and also tries to illustrate with respect to those, where we draw the line on those string emails that will hopefully enlighten the rest of the process here.

And, I'm hoping now with what you've learned at least from my views and what I'm going -- my views on some of the overarching issues, that that will be useful to you when you have a further discussion before Judge Laporte in this matter.

I will say it does seem to me that this is not a complex case, nor is it a complex case to evaluate.  Litigation risks are pretty clear.

A big unknown is how is the jury going to react to your client, and your client, and whether they have any predilections in terms of how have they respond to the evidence, and where they think fairness, et cetera, and the law lies.  But, that's always a bit of a crap shoot.

But, you have all the other parameters pretty much fixed

at this point.  So, I would urge you to take advantages of this one last chance you have before Magistrate Judge Laporte.

MR. MOLLAND:  Thank you, Your Honor.  I -- we will. And we are hopeful that the settlement conference will be fruitful.  But, given past events in the last couple of years, my optimism is tempered.

And so, I have this question for you.

THE COURT:  Yeah.

MR. MOLLAND:  Is the trial date of September 8th a trial date which the Court believes is likely to --

THE COURT:  Yes.

MR. MOLLAND:  The Court will be available on September 8th.

THE COURT:  Yes.

MR. MOLLAND:  Thank you.

THE COURT:  Yes.  It's happening.

MR. KELLER:  I don't know if it merits a response, but this -- this comment about things that happened in the past, I mean, I could equally say how absurd the demands are.

I mean, I think we're all trying to approach this case reasonably at this point in time, trying to avoid the trial. But, I just didn't want some suggestion laying out there that, again --

THE COURT:  You know, I -- those comments don't mean much to me, and I'm not going to --

**MR. KELLER:** Yeah. I understand, your Honor.

**THE COURT:** I have assigned this case with a very experienced Magistrate Judge. I've gone through this in detail, to give you as you much insight as I can as to what the scope of this trial is going to look like, so you can assess your risks and realize certain things are off the table, certain things are on the table, and to show you that we are on. If you don't settle this case, we're on.

**MR. MOLLAND:** Thank you very much, Your Honor.

**THE COURT:** Okay thank.

**MR. KELLER:** Thank you, Your Honor.

(Off-the-Record discussion between the Court and the Law Clerk)

**THE COURT:** In terms of the jury instructions, yes. The remaining instr- -- I would like for you to meet and confer, and let's say by the end of Thursday, to see if there's any ones that you can resolve, either take off the table, modify, put back on the table, so I know what universe I've got to resolve.

I'm hoping that with what I've just indicated to you all over the last two hours, that there wouldn't be much dispute in terms of what the jury instructions would look like. And you can reserve -- to the extent that you reserve your objection about my non-inclusion of non-economic damages, you can do that.

But I would like to get the form of the instructions in --

MR. MOLLAND: Sure. And, I think we can do that, Your Honor. I think we aren't that far apart on most of the instructions.

THE COURT: Good. Great. Appreciate it. Thank you.

(Proceedings concluded at 4:15 p.m.)

## CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  *Belle Ball*

Friday, September 5, 2014

Belle Ball, CSR 8785, CRR, RDR